[Crim. No. 8573. In Bank. Jan. 4, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. AARON
MITCHELL, Defendant and Appellant.

Aaron Mitchell, in pro. per., and Evander C. Smith, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—A jury found defendant guilty of first degree murder and fixed the penalty at death. On appeal, we affirmed the judgment as to guilt and reversed insofar as it related to the penalty (61 Cal.2d 353 [38 Cal.Rptr. 726, 392 P.2d 526]). Upon retrial, the jury again fixed the penalty at death. This automatic appeal followed, pursuant to section 1239, subdivison (b), of the Penal Code.

*Facts*:[1] At approximately 10:30 p.m. on February 15, 1963,

---

[1] The facts are stated in detail in our former opinion (61 Cal.2d 353 [38 Cal.Rptr. 726, 392 P.2d 526]) and will be only briefly summarized here.

defendant, armed with a shotgun and wearing a hood, entered the Stadium Club, a bar and restaurant in Sacramento, for the purpose of committing a robbery. After directing the customers and the personnel to the middle section of the club, he fired his shotgun into the ceiling, stating, "That's just to let you know it's loaded. Get moving." On defendant's demand, one of the owners opened the cash register, and defendant took the contents.

In the meantime, one of the owners had, unknown to defendant, been able to contact the police by telephone and report that a robbery was in progress at the club.

The front door had been locked at defendant's direction, and as defendant approached it to leave the club, he saw the face of Officer Bibica through the porthole. He then turned and ran to the kitchen area. There he unexpectedly encountered Officer Shaw. Having the draw on Shaw, defendant required him to disarm. He then picked up Shaw's revolver and, grabbing Shaw, proceeded to the back porch area using him as a shield.

Officers Reese and Gamble had meanwhile appeared on the scene and were entering the back porch at the time defendant reached it. In the exchange of shots which followed, Officer Shaw was hit in the left thigh, defendant was wounded, and Officer Gamble was killed. Defendant fled on foot but was captured a short distance from the club in an old shed.

Defendant testified that when he reached the porch area, he stated, "You got me," meaning he wanted to surrender; that at this point it appeared someone said, "Get him"; that the firing of guns commenced; and that he did not remember any of the events thereafter, such as his firing Officer Shaw's gun or the shotgun, being wounded by Officer Gamble, or entering the shed where he was apprehended.

 *Questions*: First. *Did the district attorney commit prejudicial error in referring to defendant as a professional robber in his argument to the jury?*

*No.* In his argument the district attorney several times referred to defendant as a professional robber, but no objection was made to his remarks.[2]

---

[2]In commenting upon the evidence as to defendant's preparation for the robbery of the Stadium Club, the district attorney said: "At that time, by his own testimony, he states that he put on a second set of clothes, the light clothes underneath, the dark clothes over the top, and the hood, which you have seen as part of the clothing effects taken from the Defendant. He loaded his shotgun with two live rounds, he put a

██ Misconduct in argument may not be assigned on appeal if it was not assigned at the trial, unless the misconduct contributed to the verdict or was so unredeemable that nothing whatever would have cured it. (*People* v. *Rosoto*, 58 Cal.2d 304, 357 [52] [23 Cal.Rptr. 779, 373 P.2d 867]; *People* v. *Lyons*, 50 Cal.2d 245, 262 [12, 13] [324 P.2d 556].) Such was not the case here.

██ ██ Furthermore, it is settled that a prosecutor may use appropriate epithets warranted by the evidence (*People* v. *Ketchel*, 59 Cal.2d 503, 540, [44] [30 Cal.Rptr. 538, 381

---

handful of shotgun shells into his pocket and took off for the general area at the rear of the Stadium Club.

"Now, as you can see, and as the Defendant will admit, the purpose of putting on two sets of clothes is to hide his identity when he makes his robbery and his escape, so that when he removes the dark clothing, he's in light clothing, and his description is immediately different than what it was, than the victims would give to the police. This is the mind of a professional robber."

In commenting upon the evidence pertaining to defendant's alleged surrender, the district attorney stated: "Now, going back again, I'll ask you what kind of a man is this who sees an officer, professional robber who sees an officer, Bibica, at the front, and he doesn't surrender. He has the drop on Shaw in the kitchen, and he can surrender easily, without fearing that Shaw's going to gun him down, because Shaw doesn't even have his gun out. And then he moves into this area here (indicating), and he would have you believe he was surrendering when he allegedly said, 'You've got me,' but I don't find any testimony or any evidence that he threw his guns down when he said, 'You've got me.' On the contrary, he fires the first shot and starts the fusillade of bullets flying on that back porch."

Referring to the robbery of the Stadium Club, the district attorney stated: ". . . I would like to read to you his reason why, as testified to by the Defendant in reply to a question by Mr. Salamy [defendant's attorney]:

"'After I had ran around most of the day trying to get some money to pay my lawyer on this other robbery they claimed I had committed, I come to the conclusion that, well, if they're going to say I committed a robbery, so, well, I think I'll do one; so I—that's what I did.'

"That's an incredible statement, and, to me, along with the statement, 'Well, if—if you're going to commit a robbery, you can't commit a robbery with an unloaded gun,' is as dangerous an answer or an explanation as you'll ever hear from a witness stand. Now, clearly, this man is a professional robber, and as such is always prepared. He's told you that from the stand. He's armed. He always is armed, at least if you're going to pull a robbery, by your own admission. Now, this is a professional robber, and you notice that in the professional approach to the Stadium Club: the disguise clothes, the checking out the lay of the land, coming up behind the Stadium Club, looking in—how many people are there, who's there, who's the manager, where's the safe, where's the manager—the loaded gun, the hood, which is a variation on a stocking cap. It's all intended to be a disguise."

Also, in reviewing the evidence pertaining to defendant's attempts to escape following the robbery, the district attorney stated, "Again we're talking about the professional robber's approach to an escape when the chips are down. . . .''

P.2d 394]; *People* v. *Terry,* 57 Cal.2d 538, 561 [13] [21 Cal. Rptr. 185, 370 P.2d 985]; *People* v. *Wein,* 50 Cal.2d 383, 396 [7] [326 P.2d 457]), and in the present case the district attorney's characterization of defendant as a professional robber was warranted by the evidence.

Defendant testified that in 1947, at the age of 17, he was arrested in Missouri for stealing a car; that he was sentenced to two years' imprisonment therefor and served 14 months; that upon his release he again committed a car theft, for which he was sentenced in October 1948 in Tennessee to three years on a chain gang; that he escaped after 10 days, but in 1951 was taken into custody in Chicago on other charges and subsequently returned to Tennessee; that he thereafter served 31 months, including six months imposed for the escape; that he was released in the summer of 1954; that in September of that year he held a gun on two employees of a country club near Denver, Colorado, and then assaulted the manager with the gun; that he pleaded guilty to assault with intent to commit a robbery in connection with the incident and was sentenced to a term in the Colorado State Prison; that in April 1959, while on parole, he was stopped by police officers, who discovered a stocking mask hanging on a metal hinge of the convertible top of the car he was driving, a loaded revolver behind the sun visor on the driver's side, and an unloaded gun on the passenger's side; that, as a result, his parole was revoked and he was returned to the Colorado State Prison; and that he was released in January 1961.

Defendant further testified in several respects as though he was an expert on how to commit a robbery. For instance, he said: "Well, if—if you are going to commit a robbery, you can't commit a robbery with an unloaded gun, for one thing, and if you are going to commit a robbery, it's—it's best to let the people know that the gun is loaded so won't nobody get hurt than for somebody to think it isn't loaded and they grab it and it goes off and somebody gets hurt." Then, in answer to a question whether he was going to shoot someone if he had trouble, he replied, "No, you don't shoot anyone."

He also testified: "Now, I shot into the ceiling of the place. This—this was done for the sole purpose of—it was actually done to keep anybody from getting hurt. You can't commit a robbery if you—if you—the people think you playing."

In any event, however, for the most part the district attorney's statements referring to defendant as a professional robber pertained to his activities in robbing the Stadium Club.

Accordingly, the alleged misconduct could hardly have "contributed to the verdict" or been "so unredeemable that nothing whatever would have cured it."

■ Second. *Did the trial court commit prejudicial error in statements concerning defendant's automatic appeal to the Supreme Court?*

*No.* During the *voir dire* examination of prospective juror Sandberg, the trial judge, in answering a question by Mr. Sandberg, mentioned that there is an automatic appeal in all cases where a verdict of death is rendered. At the next recess defendant's attorney, outside the presence of the jury, informed the trial judge that he was concerned that if the jury was repeatedly advised that a judgment imposing the death penalty had been rendered in the first trial and then reversed by this court, the individual jurors might conclude that if the death penalty should be imposed again, there was a likelihood that this court would again reverse it, and that as a result some of them might feel that their responsibility had been lessened.

The trial judge said that he had been loath to bring up the subject but that when the direct question was asked, he felt he had to state what the facts and actual situation were; that he planned to inform the jurors, after selection had been completed, that they were not to consider his comment; and that he did not intend to repeat the explanation he had given but would merely indicate that there had been a prior verdict and that the judgment rendered thereon had been reversed.[3]

---

[3]The following proceedings occurred: "Q. [By Mr. Price, district attorney, to prospective juror Sandberg]: And you understand that here, in this particular phase of this trial, that the Defendant has already been convicted of First Degree Murder and that your function as a juror is to listen to the evidence and determine the credibility of the witnesses, the believability of the witnesses under the rules given to you by the Court, and then determine which penalty you feel is the appropriate one under all the circumstances, do you?

"A. That's right. I do have one question in this area though. I may be out of order, but, you see, now I am sitting here, I don't know why we are here. Do you follow me on this question? The man has been tried and found guilty. And now, why is this Court in session at this time?

"The Court: I might state to the jury that in all capital cases where the verdict of death is rendered, there is an automatic appeal, and that was the situation in this case. The matter went up to the Supreme Court on the automatic appeal, and the Supreme Court found that, due to an error that was committed in the Court's instructions, that the matter, insofar as the penalty was concerned, the Defendant had, as a matter of

Defendant contends that under the principles stated in *People* v. *Morse,* 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], the trial judge committed prejudicial error in his statements concerning the automatic appeal.

In the *Morse* case the giving of an instruction that the trial judge had the power to reduce a death penalty to a sentence of life imprisonment was held to be error, on the ground that such an instruction "may very well induce the jury to assume that its finding for the death penalty merely initiates a series of procedures which invoke a reconsideration of the penalty and which may result in its reduction to life imprisonment" and "the impact of the instruction must necessarily weaken the jury's own sense of responsibility." (P. 649.)

This court, in discussing the instruction on the power of

---

fact, been prejudiced. So they reversed the decision on the penalty and sent it back for retrial on that issue.''

At the next recess, the following statements were made by the court and counsel outside the presence of the jury:

''Mr. Salamy: Your Honor, at the question of Mr. Sandberg, who has previously been dismissed for cause, your Honor answered his question by informing him that the first trial was reversed and that is the reason for his coming back for a second penalty trial. I understand, from the Morse Decision, your Honor, I am sure you do too, that while it appears to be necessary to inform the jury in a general way that there is a parole system in the State of California and, I take it, that there is a Supreme Court in the State of California, my impression from reading the case is that they don't want too much said on the matter. And I'd like to move that your Honor at this time not consistently or repeatedly advise the jury of the fact that this case was penalized by the death penalty originally by the jury and reversed by the higher court, for the reason I am afraid the jury may attach too much significance to the fact that the jury, the first jury, voted the death penalty and if the Supreme Court stepped in before, there is some likelihood that the Supreme Court may again, if they vote the death penalty. I am concerned with taking some of the responsibility away from the individual jurors.

''The Court: Well, at the outset, Mr. Salamy, I was loath to bring up the subject, but when the question, the direct question, was asked, I knew of no way out, except just to tell what the facts were and what the actual situation was. In view of that I plan, when the jury has ultimately been selected, to tell them that it was necessary for the Court to make an expression as to what had happened heretofore and to admonish them they were not to consider that in their deliberations whatsoever. And I don't see how else it could have been handled, really, without a fabrication.

''Mr. Salamy: I am not suggesting there was any impropriety, I just didn't want to have it repeated over and over again.

''The Court: Oh, I don't intend to do it, and if the question is asked again, I will refrain from expressing what the prior verdict was, merely that there was one and that it was reversed and the case sent back.''

After the prosecution's opening statement, the trial judge admonished the jurors that defendant was entitled to their individual judgments and that they were not to give any consideration to the first jury's assessment of the penalty.

the trial court to reduce the penalty, reviewed the cases of *People* v. *Linden,* 52 Cal.2d 1 [338 P.2d 397], and *People* v. *Sampsell,* 34 Cal.2d 757 [214 P.2d 813]. Those cases held it was error for the prosecutor to argue that the death sentence would be reviewed by this court and that therefore the decision as to penalty was not entirely the responsibility of the jury.

In the *Linden* case, the prosecutor stated " '. . . in California we have a law that where a death penalty is imposed . . ., it goes immediately to the Supreme Court of the State of California. They review your decision if a death penalty is imposed, and they determine from the law whether such a penalty is justified, or if they believe the evidence is such that only a second-degree murder was committed, or they could determine that there was prejudicial error.' " (52 Cal.2d at p. 26 [26a].)

In the *Sampsell* case, the prosecutor said : ". . . the State of California has what is known as an automatic appeal in a death case, and *it is not entirely your responsibility. Your verdict must be approved in a death case by the Supreme Court of the State of California* . . . to be sure that the Supreme Court is in agreement with your verdict. *So it is not all your responsibility.* It is part of the Supreme Court of the State of California's responsibility . . . So that you are not assuming the entire responsibility at all. But if you are convinced . . . that he is guilty of first degree murder in this case, and there should be no recommendation, in such event the Supreme Court will pass upon that. Then it will be their responsibility, after you have passed on the facts and the evidence in this case." (34 Cal.2d at p. 762 [2].)

Such arguments were condemned because they tended to diminish the jury's sense of responsibility. (*People* v. *Morse, supra,* at p. 650.)

In the present case, it would have been preferable had the trial judge indicated only that the Supreme Court reversed the judgment rendered in previous penalty proceedings and sent the case back for retrial on that issue, without adding that there is an automatic appeal whenever the death penalty is imposed. (See *People* v. *Morse, supra,* 60 Cal.2d 631, 649; *People* v. *Linden, supra,* 52 Cal.2d 1, 27 [31].) However, his remarks were totally different in content from those of the prosecutor in the *Linden* and *Sampsell* cases.

In a straightforward answer to a prosecutive juror's ques-

tion, he simply stated that in all cases where a verdict of death has been rendered there is an automatic appeal, and that on such an appeal in the present case the Supreme Court had reversed a previous judgment with respect to the penalty because of an error committed by the trial court in instructing the jury and had remanded the case on that issue. There was no particular emphasis placed on the statement, and at no time did it tend to diminish the jury's sense of responsibility in determining the penalty to be imposed.

In the *Linden* and *Sampsell* cases, on the other hand, the prosecution strenuously argued to the jury, either explicitly or in effect, that because the Supreme Court would review the judgment if their verdict provided for the death penalty, the responsibility was not entirely theirs.

Under the circumstances, the trial judge's statement did not constitute prejudicial error.

■ Third. *Did the trial court err in limiting the testimony as to defendant's conduct on death row?*

*No.* Defendant's counsel introduced evidence of defendant's good conduct during incarceration on death row. He also attempted to show by contrast that other condemned prisoners were troublemakers and committed various acts of misconduct.[4]

The trial judge, in ruling that the conduct or behavior of other inmates was not material, stated: "Yes. I think the jurors understand that men are there, either waiting sentence or sent to death, and I think they, in their good old common sense, know what their problems would be; but to have this gentleman testify as to what other prisoners do, I think would

---

[4]Defendant's counsel, outside the presence of the jury, stated his position as to the introduction of testimony to show the conduct of other inmates: "MR. SALAMY: Your Honor, counsel's objection is that anything that occurred in the presence there on death row of the officer, lieutenant, that was an occurrence committed by another person, is not material, because it has nothing to do with Mr. Mitchell. *My position is that on death row a lot of things occur up there of the nature of people talking back to the officers, of contraband being kept in the cells, of attempts to hide weapons, of narcotics, of homosexuality. A lot of things occur up there that the guards are always on the lookout for and are always trying to prevent.* Now, none of these things, as the evidence will show, Mr. Mitchell was involved in, and if I can't show the jury the problems that exist up in death row by these people who have little or no hope of living, then I can't show the significance—the significant difference between Mr. Mitchell's custody while on the row with other people on the row. Now, I grant you that he is not the cause of what happens by the other people, and it may not be material as to exactly what he is doing, but his conduct is exemplary as compared with some of the other prisoners. I'd like the jury to know that." (Italics added.)

be immaterial and improper. He may testify to anything the Defendant himself did or what his demeanor was.''

The trial court properly excluded the evidence. There is no authority to support the position that the conduct of other inmates is material on the issue of a defendant's own conduct.

In addition, defendant's counsel was allowed to argue to the jury the same matters which he sought to establish by testimony as to the conduct of other inmates. He argued: ''The Court ruled I couldn't go into the trouble with the other fellows, but we know the things this fellow didn't get involved with, and I imply the others do get involved with them: homosexuality, dope, possession of firearms in the cells, booze, making of their own gin or whatever you make. These things he wasn't involved with. He was a good, model prisoner . . . .''

Defendant was not prejudiced by the court's ruling.

■ Fourth. *Did the trial court err in receiving evidence of other crimes committed by defendant?*

*No.* The People introduced evidence that the Norge Laundry in Sacramento was robbed by defendant, armed with a knife and a gun, on the night of December 29, 1962, and that defendant, while in the hospital recovering from wounds received in the Stadium Club robbery, hit a guard over the head with a hospital urinal, cutting the guard's head.

The People also introduced evidence that on April 13, 1959, in Denver, Colorado, two cruising patrolmen noticed defendant's car on the highway with only one headlight and saw the passenger throw something out of the window; that they stopped the car, came up behind it, and picked up a silk stocking, knotted at the top and with holes in it, from the convertible brace where it was caught; that they took this to be a mask; that they ordered defendant and his passenger out; searched the car, and found two guns; and that this resulted in a revocation of defendant's parole from a Colorado prison, where he was under sentence for assault with intent to commit robbery.

There was no evidence that defendant was ever convicted of any of the foregoing offenses.

Defendant relies on *People* v. *Terry,* 61 Cal.2d 137 [37 Cal. Rptr. 605, 390 P.2d 381], *People* v. *Hamilton,* 60 Cal.2d 105 [32 Cal.Rptr. 4, 383 P.2d 412], and *People* v. *Love,* 53 Cal.2d 843 [3 Cal.Rptr. 665, 350 P.2d 705], in support of his contention that it was error to admit the above evidence.

These cases do not sustain defendant's position. There is

no requirement that a defendant must have been convicted in order to introduce evidence of other criminal conduct during the penalty phase. (*People* v. *Griffin*, 60 Cal.2d 182, 190-191 [5, 4b] [32 Cal.Rptr. 24, 383 P.2d 432] ; *People* v. *Jones*, 52 Cal.2d 636, 647-648 [4, 2b] [343 P.2d 577].)

In the *Hamilton* case, *supra*, 60 Cal.2d 105, we held that proof of prior crimes is admissible during the penalty phase but that such crimes cannot be proved solely by the defendant's extrajudicial admissions.

In *People* v. *Terry*, *supra*, 61 Cal.2d 137, we stated : "We have permitted in the penalty trial a showing of the defendant's commission of criminal acts similar, or related, to the crime for which he is being tried. We have likewise sanctioned the introduction of testimony of criminal acts not necessarily related to the crime for which defendant was being tried. Records and reports, which meet the test of competency, disclosing defendant's past conduct, have been held admissible.

"As we have stated, however, the subject matter of the penalty trial cannot extend beyond certain limitations. We note three such restrictions : the evidence must not be incompetent; it must not be irrelevant, that is, of such a nature that its prejudice to defendant outweighs its probative value; and it must not be directed solely to an attack upon the legality of the prior adjudication. Previous decisions sustain the first two of these limitations; the third rests upon the self-evident prohibition of any attempt to relitigate the prior conviction." (61 Cal.2d at pp. 143-145.)

The evidence in the present case meets the requirements of the *Terry* case. Competent evidence established the incidents in question; the prosecution did not seek to prove the facts by inadmissible hearsay.

 All the evidence was relevant. The evidence regarding the Norge Laundry robbery pertained to the similar offense of robbery, a crime in which defendant was engaged at the time he murdered Officer Gamble. The Norge Laundry robbery and the Stadium Club robbery were closely related in time. There were certain similarities in the commission of these robberies; i.e., in each instance a mask was used, an attendant outside the premises was accosted, and the robber was armed with a firearm.

 Evidence of possession of the guns and robbery paraphernalia, designated by defendant as the parole violation incident, was clearly relevant. Defendant was then on parole after having been sentenced for assault with intent to commit

robbery. This evidence was relevant to show that he was not amenable to the processes of rehabilitation but preferred to arm himself under circumstances which strongly indicated preparation for robbery.

The hospital incident, although occurring after the murder of Officer Gamble, was likewise relevant. In *People v. Bentley*, 58 Cal.2d 458, 460 [3] [24 Cal.Rptr. 685, 374 P.2d 645], it was held that evidence under Penal Code section 190.1 as to a defendant's actions after the crime was committed may be as relevant to the issue of penalty as his conduct before the crime. Here, as in the *Bentley* case, the jury was entitled to know that defendant was not revulsed by the murder he had committed, but was willing to commit another act of violence.

The evidence of defendant's conduct, including other offenses, was properly admitted for the consideration of the jury in assessing the penalty.

In addition, the trial court instructed the jury: "Evidence of other crimes alleged to have been committed by the Defendant may not be considered as evidence in aggravation unless proved beyond a reasonable doubt. Reasonable doubt is defined as follows: it is not a mere possible doubt, because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty that such other crime has been committed by the Defendant."

As to the Norge Laundry robbery, the court instructed: "The Defendant in this case has introduced evidence tending to show that he did not participate in and was not present at the time and place of the commission of the alleged robbery of Norge Laundry and Dry Cleaning establishment. If, after a consideration of all the evidence in this case, you have a reasonable doubt that the Defendant was present at the time the crime was committed, and that he participated in the alleged crime, then you may not consider such evidence in aggravation of the penalty."

The jury was adequately instructed on the subject of other offenses, and there was no prejudicial error.

Fifth. *Did the trial court err in receiving in evidence on rebuttal the testimony of defendant?*

*No.*

At the time of trial, comment on a defendant's failure to explain or deny by testimony any evidence against him was permitted in the trial courts of this state. (Cal. Const., art. I, § 13; Pen. Code, § 1323; *Adamson* v. *California,* 332 U.S. 46, 56 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223]; *People* v. *Adamson,* 27 Cal.2d 478, 494-495 [22] [165 P.2d 3]; *People* v. *Torres,* 185 Cal.App.2d 168, 172-173 [6] [3 Cal.Rptr. 135].) Thereafter, in *Griffin* v. *California,* 380 U.S. 609, 613 [85 S.Ct. 1229, 14 L.Ed.2d 106], the Supreme Court of the United States held that our comment rule violated the Fifth Amendment privilege against self-incrimination.

Defendant contends that the reason he took the stand was to avoid giving the prosecution an opportunity to comment to the jury on his failure to explain or deny by his testimony evidence against him and that since it is now clear that the comment rule violates the Fifth Amendment privilege against self-incrimination, the trial court should not have received his testimony in evidence.

 The rule is established that error will not be presumed on appeal. (*People* v. *Farrara,* 46 Cal.2d 265, 268 [4] [294 P.2d 21]; *People* v. *Wissenfeld,* 36 Cal.2d 758, 767 [11] [227 P.2d 833]; *People* v. *Chessman,* 35 Cal.2d 455, 462 [8] [218 P.2d 769, 19 A.L.R.2d 1084].)

A ruling of the trial court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. (*People* v. *Ketchel,* 59 Cal.2d 503, 531 [27] [30 Cal. Rptr. 538, 381 P.2d 394]; see 3 Witkin, Cal. Procedure (1954) Appeal, § 79, p. 2238; 24A C.J.S. (1962) Criminal Law, § 1856, p. 651.)

 Defendant has failed to overcome the presumption of the correctness of the trial court's ruling.

The prosecution presented detailed evidence on the robbery at the Stadium Club and the killing of Officer Gamble. Evidence was also presented of other crimes allegedly committed by defendant and referred to in question *Fourth* above, that is, the robbery at the Norge Laundry and the assault on one of the guards assigned to defendant while he was a patient in the hospital recovering from wounds received in the Stadium Club robbery, as well as the 1959 revocation of defendant's parole from the Colorado State Prison because of his being found under circumstances strongly suggesting preparation for robbery.

Defendant took the stand and on direct examination gave

an account of the Stadium Club robbery that did not differ in substantial detail from the evidence presented by the prosecution, except he claimed that just before the shooting started he said, "You got me," thereby attempting to surrender, and that about that time he heard the first shot but did not remember "squeezing off" any shots and, in fact, did not remember anything from the time the shooting started until he regained consciousness in the ambulance after his capture.

He further testified that his purpose in shooting into the ceiling of the Stadium Club at the commencement of the robbery was to keep anyone from being hurt; that it had never entered his mind that anyone would be killed during the perpetration of the robbery; and that after he was captured, he kept asking if anyone had been hurt.

He also testified that he had not had much formal education, having gone through only the eighth grade; that when he was 14 years old, his parents had separated; that while a teenager he was convicted of two car thefts and served time therefor; that his sentence for the second car theft was three years on a chain gang in Tennessee; and that after he was released from prison in Colorado in 1961, he came to California and was quite steadily employed here. He also testified regarding his kindness to children and his good relationship with his 14-year-old son.

As indicated above, although defendant admitted on direct examination that he had committed the robbery at the Stadium Club and did not deny the evidence against him with respect to the killing, he testified that he had attempted to surrender just prior to the shooting and could not remember what happened after the shooting started.

Defendant, of course, stood convicted of first degree murder for the killing of Officer Gamble, and no evidence of any attempt on his part to surrender had been introduced at this penalty trial before he took the stand. Under the circumstances, it would appear that his chief purpose in testifying with respect to his actions at the Stadium Club was to present evidence of his alleged surrender attempt.

Under the comment rule, a defendant's failure to explain or deny by his testimony any evidence against him could be commented upon whether or not he testified. (Cal. Const., art. I, § 13.) Therefore, since defendant did not deny on direct examination that he had committed the Norge Laundry robbery or that the evidence presented by the prosecution regarding the revocation of his parole in Colorado was inaccu-

rate in any respect, he cannot be heard to say that he took the stand so that the prosecution could not comment on his failure to explain or deny such evidence.[5]

Defendant attempted on both direct and redirect examination to explain why he had assaulted the guard at the hospital, but he contradicted himself in material respects.[6] It would be illogical to assume, therefore, that he testified regarding the assault in order that the prosecution would not be in a position to comment on his failure to explain or deny the evidence against him with respect thereto.

Moreover, from defendant's testimony on direct and redirect examination, it is clear that he took the stand hoping to win the sympathy of the jurors and thereby increase his chances of receiving a sentence of life imprisonment instead of death.

Accordingly, his argument that his purpose in testifying was to avoid the adverse consequences possible under the comment rule is unconvincing.

 In any event, however, as pointed out in *People* v. *Bostick*, 62 Cal.2d 820, 823 [3] [44 Cal.Rptr. 649, 402 P.2d 529], unless the comment has resulted in a miscarriage of justice, reversal is not required. (Cal. Const., art. VI, § 4½.)

Under the circumstances here, no showing could be made that a miscarriage of justice would have resulted if defendant

---

[5]On his cross-examination defendant denied that he committed the Norge Laundry robbery, and on his redirect examination he sought to establish an alibi for that offense.

[6]Defendant testified on direct examination: ''Well, that—that is really a hard situation to explain, because it comes from depression and emotion. You can't hardly explain it to people, just how you feel about a certain thing. It really is hard to explain. But I felt that that man was rousting me, uncalled for. I felt that. And I could have been wrong—in fact, I know I was wrong in hitting the man, but I did hit him, I admit that. I did hit him, but I felt he was wrong in rousting me in the way he was there every night.''

On redirect examination, he testified: ''Q. . . . do you know what the real reason was why you hit Mr. Houston [the guard] on the head, was it because he was irritating, or was it something else? A. Well, it's—it's not too hard to explain, but it's hard for people to understand how you feel like this. I had found out that they said I killed a police officer and I figured they were going to kill me and I just didn't—didn't want to live any more and when I hit the man, I figured he was going to shoot me, or if he didn't shoot me, I may get a chance to get away, too, see, because the—but the reason I hit him was because I figured they was going to kill me and I didn't want to live. After I hit him, I just lay back in the bed, lay right there. In fact, I wished he had of shoot me, because I don't want to die in no gas chamber. Q. Mr. Mitchell, isn't it fair to say that you were thinking, perhaps, not only about getting yourself shot, but also of getting away? A. If he had of fell down, I would have tried to get away, because I don't want to die in no gas chamber.''

had failed to testify and the prosecutor or the court had commented on such failure. Therefore, even if it is assumed that defendant took the stand so that the prosecution would not be in a position to comment on his failure to deny or explain the evidence against him, he is in no position to contend that prejudicial error resulted, for the reasons alleged, from the reception of his testimony into evidence.[7]

Sixth. *Should this court reduce the punishment to life imprisonment?*

*No.* This court has uniformly rejected requests to reduce the penalty from death to life imprisonment. No error contributed to the choice of penalty, and we have repeatedly held that the trier of fact has the sole responsibility and absolute discretion to select the penalty for first degree murder. (*People* v. *Howk,* 56 Cal.2d 687, 699-701 [3-5] [16 Cal.Rptr. 370, 365 P.2d 426] and cases there cited.)

The judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Peek, J., Burke, J., and Van Dyke, J. pro tem.,* concurred.

Appellant's petition for a rehearing was denied February 2, 1966. Mosk, J., did not participate therein.

---

[7]Our decision affirming the judgment as to guilt (61 Cal.2d 353) has long since become final. However, even if the *Griffin* case had been decided prior to the time our decision was rendered, and defendant had timely raised the same question with respect to his testimony at the trial on the issue of guilt, we would have been forced to reach the same conclusion there.

Defendant had pleaded guilty to the charge of robbery, and at the trial on the issue of guilt eyewitnesses had testified regarding the killing of Officer Gamble. Accordingly, at the time defendant took the stand there was no reasonable probability that the jury would not find him guilty of first degree murder on the basis of a killing committed during the perpetration of a robbery.

Defendant, however, apparently seeking to take his case out of the felony-murder rule, testified that he attempted to surrender just prior to the commencement of the shooting. Before he took the stand, there had been no evidence of any attempt on his part to surrender. It would therefore be unreasonable to assume that his purpose in testifying was to avoid the adverse consequences possible under the comment rule.

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.