[Crim. No. 10851.   In Bank.   Sept. 3, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ANTHONY JOSE ROBLES, Defendant and Appellant.

Herbert E. Selwyn, under appointment by the Supreme Court, A. L. Wirin and Fred Okrand for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—A jury found Anthony Jose Robles and Henry Garcia Banuelos guilty of the first degree murder and robbery of Victor Brill and fixed the penalties for Brill's murder as death for Robles and life imprisonment for Banuelos. Robles' appeal is automatic (Pen. Code, § 1239, subd. (b).) Banuelos is not a party to this appeal.

Defendant Robles contends that the trial court should not have given an instruction to the jury on first degree premeditated and deliberate murder, as well as murder committed during the perpetration of or attempt to perpetrate a robbery. As we shall point out, sufficient evidence supports the instruction given by the trial court, and the verdict of guilt must stand. As to the jury's determination of the penalty we consider and reject defendant's argument that the trial court's introductory remarks to the prospective jurors concerning defendant's right to appeal constituted reversible error. Defendant's contention that he should have been permitted to close the argument at the penalty phase fails because no such procedure prevailed at the date of his trial, and even if it had, its non-fulfillment could not have been prejudicial. Finally, we conclude that no prospective jurors were excluded in transgression of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

Hanna Brill testified at the guilt phase as to the circumstances of her husband's death. According to her testimony, defendant and Banuelos entered a ready-to-wear and tuxedo rental shop operated by the Brills at 2 p.m., June 29, 1966. They said that they wished to purchase some shirts and slacks; with Mrs. Brill's assistance they selected several items

of clothing. As she was writing up the sales slips, defendant walked into an adjacent workshop, where Mr. Brill was pressing some slacks. She heard her husband say, "This is a holdup"; at that point Banuelos told her to get out from behind the counter. Defendant and Brill moved back into the shop area, and defendant told the Brills to stand in a particular place. He then asked, "Where is the money?" Brill replied, "in the cash drawer. Just help yourselves, and if there is anything you want we are not going to resist." Defendant continued to question the Brills about the money and held a gun to Mrs. Brill's head, saying, "If you don't tell us where the money is, I will kill her."

Defendant and Banuelos then told the Brills to move into the office area of the shop; after entering the office Mrs. Brill was instructed to get to her knees, and her hands were tied behind her back. Banuelos held her down by placing his knee on her shoulder. Hearing a scuffling sound, she turned around and saw her husband on his knees with defendant behind him. Defendant's hand, holding a gun, was in the air, and she observed her husband raise his arm. At that point Banuelos turned her around. She then heard a noise sounding like a firecracker, and, turning around, she observed her husband lying on the floor. Defendant and Banuelos left the store, whereupon she summoned the police and an ambulance.

The cash register, which had earlier contained about $25 or $30, was empty, and the clothing selected by defendant and Banuelos was gone. Brill had suffered two gunshot wounds from a .25 caliber automatic, either of which would have been fatal. One bullet had passed laterally through his chest, and the other had entered from his back.

Investigating officers recovered two empty shell casings as well as a live round from the floor. They recovered a gun from defendant's locker at his boarding house which, according to expert testimony, had fired the bullets. In addition, finger and palm prints, identified as those of Robles and Banuelos, were found on the counters in the store.

## 1. *Instructions on first degree murder*

■ Defendant contends that the trial court should not have instructed the jury that it could find him guilty of first degree murder if it found that the murder was willful, deliberate, and premeditated. He argues that Mrs. Brill's testimony does not provide a sufficient basis for an inference that defendant deliberately fired the gun with intent to kill. She testified: "I saw my husband on his knees with Robles

behind him, and he had him all bound, and [Robles's] hand was up in the air with this gun in it. . . . It was his right hand and I saw my husband, his arm come up. I don't know what arm it was, to ward it off." Defendant argues that the testimony at most reveals that during the course of a struggle with Brill the gun discharged.

We find sufficient evidence from which the jury could conclude that defendant committed willful, deliberate, and premeditated murder. (*People* v. *Schader* (1969) *ante*, p. 761 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Anderson* (1969) 70 Cal.2d 15, 23-24 [73 Cal.Rptr. 550, 447 P.2d 942].) He entered the shop with a loaded gun and threatened to kill Mrs. Brill. Two bullets were fired from the gun, one of which struck Brill from the back. From the testimony that a live round was found upon the floor of the store, the jury could properly infer that defendant had ejected the round in order to insure that his gun was loaded. Moreover, the jury need not have believed that Brill was struggling with defendant; Brill had earlier stated that he would not resist, and the gesture described by Mrs. Brill was protective in nature.

### 2. *Alleged misconduct of district attorney*

█ Defendant assigns as misconduct the prosecutor's argument to the jury at the penalty phase that the killing was "cold-blooded" and that defendant had apparently ejected the live round, found upon the floor of the store, in order to insure that his gun was loaded. These statements are not without evidentiary support in the record. Furthermore, defendant urged no objection at trial to these arguments. "Although some comments by a prosecutor may place the defense at a disadvantage which no admonition by the trial judge can effectively cure before irreparable harm results [citations], the remarks challenged in this case were not of that character." (*People* v. *Modesto* (1967) 66 Cal.2d 695, 716 [59 Cal.Rptr. 124, 427 P.2d 788].)

### 3. *Instruction to veniremen that defendant, if found guilty, had the right to appeal*

█ Defendant assigns as error affecting the penalty phase the trial court's instruction to the veniremen that defendant, if found guilty, would have the right to appeal.[1] He relies on

[1]The court stated to the prospective jurors: "Are you of the frame of mind you can follow the law as I give it to you, notwithstanding any ideas you may entertain with respect to the law? . . . Now, it is extremely important and it is important for a great number of reasons that

*People* v. *Linden* (1959) 52 Cal.2d 1, 26-27 [338 P.2d 397], in which the prosecuting attorney stated in argument to the jury that if a death penalty was imposed, defendant would have an automatic appeal to this court. We held that "[t]he jury have no concern with and should not be informed of the automatic appeal where judgment of death is imposed . . . ." (52 Cal.2d at p. 27.)

In *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], we explained the vice of the argument condemned in *Linden*: "Since the jury undertakes the task of assessing the penalty in the wide latitude of absolute discretion and in the absence of statutory guide lines, the suggestion that higher authorities will *review* its decision must profoundly affect it. . . . The impact of the instruction must necessarily weaken the jury's own sense of responsibility. Yet nothing should be introduced to the jury to detract from its most careful consideration of the choice of penalty. That effort should not be adulterated by the infusion of foreign and deflecting factors." (60 Cal.2d at p. 649.)

We do not condone the trial court's statement to the veniremen. Nevertheless, we conclude that no *"substantial deviation from the standards established in Morse . . .* has occurred." (*People* v. *Hines* (1964) 61 Cal.2d 164, 170 [37 Cal.Rptr. 622, 390 P.2d 398].) (Italics added.) The admonition could not have significantly affected the jury's deliberations as to the penalty.[2] The trial court did not inform the jury of the automatic appeal in the event it imposed the death penalty but rather referred only to the consequence of a verdict of guilt. The improper argument in *Linden* and instruction in *Morse*, we held, distorted the jury's function in exercising its discretion as to the choice of penalty. The trial court's instruction in the instant case, however, viewed in

---

you do this, and I only want to tell you one and that is this. If the defendants are found guilty they have a right to appeal. The case goes before an Appellate Court or the Supreme Court and that court reviews the entire proceedings, particularly the law involved. I am sure you are all aware of the fact that no one knows what goes on in the jury room except the twelve persons that are up there deliberating. As a result of that the Appellate and Supreme Court presume that you followed the law as I gave it to you so, if in the course of your deliberations you happen to use some other law and if, as a result of that, an injustice occurs, there is no way they can reach and correct this injustice. On the other hand, if I give you the wrong law, and that can happen, and an injustice occurs on that account, they still abide by the same presumption and they can reach and correct the injustice, and you understand that, and I am sure you will all follow the law as I give it to you."

[2] Defendant does not contend that this error prejudicially affected the jury's determination of guilt.

ntext, merely stressed the importance of adhering to the law s set forth by the trial court.

In *People* v. *Mitchell* (1966) 63 Cal.2d 805 [48 Cal.Rptr. 71, 409 P.2d 211], we found a similar error nonprejudicial. n *Mitchell* the trial court had, in answer to a venireman's uestion, informed the prospective jurors of the right of auto- natic appeal. We pointed out that, "[t]here was no particu- ar emphasis placed on the statement, and at no time did it end to diminish the jury's sense of responsibility in deter- nining the penalty to be imposed." (63 Cal.2d at p. 814.)

### 4. *Closing argument at the penalty phase*

Defendant further contends that the trial court hould have permitted him to make the final argument in the enalty phase of the proceedings. In *People* v. *Bandhauer* (1967) 66 Cal.2d 524 [58 Cal.Rptr. 332, 426 P.2d 900], we econsidered the practice of permitting the prosecution to pen and close argument at the trial on the issue of penalty. Noting that "[e]qual opportunity to argue is . . . consistent with the Legislature's strict neutrality in governing the jury's choice of penalty," we held that "hereafter, the prosecution should open and the defense respond. The prose- ution may then argue in rebuttal and the defense close in surrebuttal." (66 Cal.2d at p. 531.)

Defendant, however, cannot claim the benefit of the pro- spective *Bandhauer* rule (see *People* v. *Hill* (1967) 66 Cal.2d 536, 564, fn. 7 [58 Cal.Rptr. 340, 426 P.2d 908]), as his trial occurred prior to our decision in *Bandhauer*. Moreover, we have pointed out that "there is no reasonable probability that the sequence of closing argument alone would affect the result" (*People* v. *Bandhauer, supra,* 66 Cal.2d at p. 531), and defendant does not now contend, nor did he at trial, that the prosecution exceeded the scope of proper rebuttal in clos- ing argument.

### 5. *Exclusion of veniremen for attitude on death penalty*

Finally, we must determine whether the dictates of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], compel reversal of the judgment. *Witherspoon* holds that the trial court should not excuse for cause a venire- man who has not, in unambiguous terms, expressed irrevoca- ble opposition to the imposition of capital punishment. We explain why we have concluded that no *Witherspoon* violation occurred.

The transcript of the *voir dire* examination reveals that th trial court excused for cause 14 veniremen who expresse opposition to the death penalty.[3] In an otherwise impeccabl record on this issue the single questionable instance of allege improper excusal of a venireman arises in the case of one Mr Eggers. We set forth below his *voir dire* examination:

"THE COURT: Now, do you have any conscientious scruple which would preclude you from voting for the death penalt in a proper case?

"MR. EGGERS: Yes.

"THE COURT: Mr. Ettinger.

"Q. BY MR. ETTINGER [attorney for codefendant Banuelos] Mr. Eggers, it would be a fair statement to say you coul give to both sides of this matter a fair and impartial hearing as to the guilt of the defendants?

"A. Yes.

"Q. With reference to your feelings regarding capital punishment, can you envision any case, regardless of how hor-rible the facts may be, in which you couldn't [*sic*] vote for the death penalty?

"A. It is possible, but very unlikely, sir.

"Q. Well, am I correct in saying there are some cases at least that you could envision but you don't know of the facts of that case obviously, but there are some cases in your opin-ion that are of such a nature that you could participate in voting for a death penalty?

"A. Possibly.

"Q. You would rather not, but do you think you could possibly bring yourself to that state of mind? Let me put it the other way. Are you in a position to say to me now that I cannot think of any possible case in which I would be willing to vote a death penalty?

"A. No, sir, I can't say that.

"MR. ETTINGER: Fine. Nothing further. Thank you, sir.

"MR. LATINER [attorney for defendant Robles]: I have no questions.

---

[3]Defendant contends by supplemental brief that the judgment as to guilt must be reversed because the trial court excluded for cause prospec-tive jurors who expressed opposition to the death penalty, yet stated that they could serve fairly and impartially on the issue of guilt. He raises no constitutional arguments that the majority opinion in *In re Anderson* (1968) 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117], did not consider and reject, and he does not persuade us that we should overrule *People* v. *Gonzales* (1967) 66 Cal.2d 482, 497-499 [58 Cal.Rptr. 361, 426 P.2d 929], and cases cited therein, which hold that Penal Code section 1074 does not preclude a challenge for such cause.

"Q. By Mr. Madden [deputy district attorney]: Mr. Eggers, is your frame of mind such that you cannot and could not and would not vote for a death penalty in a first-degree murder case, specifically this type of case, a robbery-murder case?

"Mr. Ettinger: I am going to object as that is not proper.

"The Court: There are no standards set for the jury because of this particular charge involved.

"Q. By Mr. Madden: Well, without restricting it to this type of case, a first-degree murder-robbery case, is your frame of mind you could not in a first-degree murder-robbery case bring in a death sentence regardless of what the evidence might be?

"A. At the present time I could not.

"Q. Your answer is you could not?

"A. Yes, sir.

"Mr. Madden: I will challenge the juror for cause because of his frame of mind.

"The Court: Let me ask the juror a question. Now, you understand that the law sets no standard; in other words, I will not tell you it is this, this and this and then the death penalty should be imposed or, if you don't find those elements, it shouldn't be, and you understand that matter is entirely up to your discretion and your sole discretion. Now, is there any case inconceivable to you that a case could not be presented to you for which you would vote a death penalty regardless of all the facts that may be presented or are you saying at this time, no matter what the case is, you could not in good conscience vote for the death penalty?

"Mr. Eggers: Yes, at this time.

"The Court: All right, is the matter submitted?

"Mr. Ettinger: Yes.

"Mr. Madden: Yes.

"The Court: Excuse the juror for cause."

Although Eggers's answers in the first instance disclose some slight possibility that he could vote for the death penalty, he ultimately concludes under the court's questioning that he could not do so, no matter what the case might be. Thus, in the earlier query by Mr. Ettinger, attorney for the codefendant, Eggers says in some imagined horrendous case: "it is possible, but very unlikely" that he could vote for the death penalty; "possibly" he could. In a somewhat ambiguous question the deputy district attorney asks the venireman "without restricting it to this type of case, a first-degree

932

murder-robbery case," could Eggers "bring in a death se
tence verdict," and receives the answer, "At the present ti
I could not." The conclusiveness of the answer, howev
becomes doubtful because of the district attorney's ina
vertent repetition in his question of the term "first-degr
murder-robbery."

No ambiguity, however, appears in Eggers's final answer
the second part of the judge's two-pronged question. The fir
prong of the query is unclear, but the second reads, "or a
you saying at this time, no matter what the case is, you cou
not in good conscience vote for the death penalty?" T
answer is an unequivocal, "Yes, at this time." Mr. Eggers
repetition of the words, "at this time," indicates that he
directing his answer to the judge's query as to what Egge
is "saying at this time," which follows the word "or"
the judge's question, and thus severs the first, alternati
part of the inquiry. Indeed, the venireman's use of the wor
"at this time" coincides with his answer to the district atto
ney's earlier question, in which instance, again, the venir
man stated that "at the present time" he could not vote fo
the death penalty. We read the answers of Eggers as estab
lishing that he would not in his present state of mind eve
vote for the death penalty, whatever the nature of the case
Hence the court properly excused him.

The judgment is affirmed.

Traynor, C. J., McComb, J., Mosk, J., Burke, J., Sullivan
J., and Schauer, J.,* concurred.

Appellant's petition for a rehearing was denied October 1
1969. Peters, J., was of the opinion that the petition shoul
be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assign-
ment by the Chairman of the Judicial Council.