[Crim. No. 10756. In Bank. Aug. 20, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. DENNIS
STANWORTH, Defendant and Appellant.

J. Vance Porlier, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Derald E. Granberg and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendant, Dennis Stanworth, was charged by indictment with, and convicted upon pleas of guilty to, two counts of murder (Pen. Code, § 187),[1] one count of kidnaping to commit robbery with bodily harm (§ 209), four counts of kidnaping (§ 207), three counts of forcible rape (§ 261, subd. 3), one count of sexual perversion (§ 288a), and one count of robbery (§ 211).[2] Pursuant to stipulation the trial court made findings as to the degrees of the murders upon its examination of the transcripts of proceedings before the grand jury and determined both murders to be of the first degree. The issue of penalty for each of the murder counts and for the count of kidnaping to commit robbery with bodily harm was tried to a jury which fixed the penalty on each of the murder counts at death and on the kidnaping count at life imprisonment without possibility of parole.[3] This appeal is automatic. (§ 1239, subd. (b).)

We set forth the pertinent facts as disclosed by the transcript of the proceedings had at the trial on the issues of penalty. On August 12, 1965, at 5:30 p.m., Miss W,[4] 20 years of age, a student nurse and an employee at a Montgomery Ward store in Richmond, was driving out of the store's parking lot. While she was stopped at a stop sign, defendant

---

[1]Hereafter, unless otherwise indicated, all section references are to the Penal Code.

[2]Defendant was first charged with 12 counts of felony by an indictment filed on August 18, 1966. Counts 4 and 5 thereof charged him with assaulting Caree Lee Collison with intent to commit murder and with kidnaping said person. Miss Collison died on September 12, 1966, and on September 20, 1966, a second indictment was filed charging defendant with her murder. Additional details as to both indictments are set forth *infra.*

[3]On the remaining counts, defendant was sentenced to state prison for the terms prescribed by law. Execution of some of these sentences was stayed pending appeal and until execution of the death sentences; execution of the other sentences was stayed pending appeal and during the service of the sentences that may be set by the Adult Authority on specified counts. All stays are to become permanent upon execution or service of those sentences on which the stays are conditioned.

[4]For reasons obvious hereafter all references to living victims of defendant's crimes are by initials.

approached and asked for a ride down the street to his car, which he said was stalled. She twice refused his request, but he reached through the open window on the passenger side, unlocked the door and entered. He exhibited a knife and threatened to use it on Miss W if she refused to take him where he wanted to go. She drove him to a parking lot of Golden Gate Fields, in Berkeley.

After Miss W stopped her car, defendant produced an insulated or covered wire and bound her hands behind her back. He then removed part of her clothing and raped her. During the act of sexual intercourse defendant told Miss W that he would have to kill her, put his hands around her throat and choked her until she lost consciousness. When she regained consciousness, defendant untied her hands, upon her promise not to attempt to escape, permitted her to dress and drove her back to the Montgomery Ward Store. During the return trip he stated that he was married and had four children;[5] that he was glad he had not killed her; that he was sorry for what had happened and that he would not do it again. Defendant was convicted on counts of kidnaping and raping Miss W.

On November 4, 1965, about 8:30 p.m., Mrs. D, 24 years of age, was walking home along a dark road from a nearby shopping center in El Sobrante. As she passed a field, defendant seized her, held an ice pick to her throat, and demanded that she submit to sexual intercourse with him. He then pulled and dragged her into the field, bound her hands with an insulated wire, tore off her clothing and forcibly raped her. Afterwards he took $15 from Mrs. D's purse and threatened to kill her. She begged for her life and told him that she had four children, whereupon he fled across the field with the money. As to the foregoing incident, defendant was convicted on counts of kidnaping to commit robbery with bodily harm, rape and robbery.

On May 13, 1966, about 9 p.m., Miss S, 17 years of age and a high school student, stopped her car at a stop sign as she drove from a school parking lot in Richmond. Defendant opened the door on the passenger side of her car and entered, exhibiting a knife. Holding the knife against her stomach, he told her she would not "get hurt" if she did what he wanted.

[5] At this time defendant was 23 years of age and had been married for three years. His marriage had produced two children and defendant had adopted his wife's two children by a former marriage. After the commencement of these proceedings defendant urged his wife to divorce him and she had obtained an interlocutory decree before the commencement of the trial.

He directed her to drive onto a side street, bound her hands behind her back with insulated wire and forced her onto the floorboards in the front seat of her automobile. He then drove to Point Richmond on San Francisco Bay, and forced her onto the beach area. He removed her clothing, after freeing her hands upon her promise that she would not "try anything." He fondled her for a short while, and then removed his penis from his trousers and indicated that she was to orally copulate him. He forced his penis into her mouth, and when she drew back, choking, he slapped her about the face and inserted his penis back into her mouth. Defendant refused to return her clothing and started back to the car. She followed him and eventually he drove her back to the high school. During the return trip he returned her clothing, and threatened her with serious consequences if she called the authorities. Defendant was convicted of kidnaping and sexual perversion, based on the foregoing incident.

On the morning of August 1, 1966, Susan Muriel Box and Caree Lee Collison, aged 15 and 14 years respectively, were hitchhiking along a highway in Pinole.[6] Defendant first drove past them, but returned and offered them a ride. With the intention of raping them, he drove the girls to Point Wilson, overlooking San Pablo Bay. He was armed with a .22 caliber pistol and forced the girls at gun point to walk across a field to a large bush, where he had them disrobe. Miss Collison attempted to escape and defendant forced her to come back by threatening the life of Miss Box. When Miss Collison returned, defendant shot her in the head probably twice. He then shot Miss Box in the head, and performed an act of sexual intercourse upon her body. He placed Miss Box's body on top of Miss Collison under the bush, and partially covered them with branches. As he was leaving the scene he heard one

[6]The victims themselves testified as to the incidents involving Miss W, Mrs. D and Miss S. Evidence of the offenses committed against Miss Box and Miss Collison consists of physical evidence at the scene of the crimes, testimony of the investigating officers, extrajudicial statements made by defendant and his testimony during the penalty phase of the trial.

No claim is made that defendant's extrajudicial statements should have been excluded on grounds proscribed in *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] or *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. The record reveals that defendant was advised in the manner required by *Miranda* for those trials commencing after June 13, 1966. (*Johnson* v. *New Jersey* (1966) 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]; *People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].) Two extrajudicial statements made by defendant were admitted in evidence on the penalty phase. The first was taken on August 4, 1966, by San Mateo County authorities and concerned an incident occurring in

of the girls moan, and he fired again at them, the bullet passing through the thigh of the drawn-up right leg of Miss Box and into her abdomen.

The girls' bodies were discovered in the afternoon of August 3, 1966. Miss Box was dead. Miss Collison was alive but in a comatose state. She never recovered consciousness. She died on September 12, 1966.

The death of Miss Box occurred almost instantaneously from brain damage caused by the bullet in her head. In addition to wounds in her head, abdomen and right leg, she had a puncture wound in the left chest caused by a sharp-pointed penetrating object, a burned or blistered area approximately one-half inch in diameter below one knee, and numerous scratch marks on her face, chest, left shoulder, hips, right thigh and right buttock. Seminal fluid was found in her vaginal canal. Defendant was convicted of counts of kidnaping, forcibly raping and murdering Miss Box.

Miss Collison died from severe bronchial pneumonia secondary to head wounds. In addition to two bullet wounds in her head, there was a third wound in her ear which may have been caused by a bullet or by some sharp, penetrating

that county on August 3, involving a Miss G (see, *infra*). Prior to making that statement, defendant read and signed the following: "I, Dennis Stanworth, have been advised of my rights to remain silent, my rights to an attorney. If I cannot afford an attorney, the State will furnish me with one. Anything I say can be used against me in a court of law. The following written statement is of my own free will." Prior to signing the statement defendant had been advised of his rights by both California Highway Patrol officers, and deputies of the San Mateo County Sheriff's office.

The second statement was made on August 12, 1966, during the course of investigations by Contra Costa County authorities, who had been summoned to San Mateo County at defendant's request. Prior to meeting with defendant the authorities notified counsel who then represented defendant in criminal proceedings in San Mateo County. Counsel was present at the interrogation and both he and the deputy district attorney advised defendant of his constitutional rights at the commencement of the statement.

During both statements defendant acknowledged that he was speaking freely and voluntarily, and he testified at the trial that the second statement was made at his request; that he made it voluntarily because "I couldn't live with it no more. I just—— I just had to get it off my chest. I knew it was wrong and I just had to tell somebody."

It also appears that defendant was cross-examined as to certain statements he made to a psychiatrist who had examined him. Although those statements do not appear as a matter of record, it does appear that the examination was arranged for and conducted with the permission of defendant and his counsel (see *In re Spencer* (1965) 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33]) and, by defendant's own admission, the psychiatrist "probably" advised defendant of his constitutional rights. The psychiatric examination took place after the admonishments in connection with the foregoing statements to the authorities.

object. Other wounds consisted of lacerations on the fingers caused by a bullet, numerous scratches on her legs and thighs, numerous small superficial marks over her face and a large part of her body, a hand-sized burned area on the left thigh, marked swelling on the left side of the face and a constriction or burn mark around the left wrist. Defendant was convicted of counts of kidnaping and murdering Miss Collison.

On August 3, 1966, two days after the attacks on Miss Box and Miss Collison, Miss G, then 18 years of age, was leaving the parking lot of a shopping center at 8:15 p.m. in Pacifica in San Mateo County, when defendant opened the door on the passenger side of her automobile and stepped in. He told her to drive him to his car, which he claimed was disabled behind a store building. After she had driven there, defendant removed Miss G's keys from the ignition, displayed a knife, and demanded her money. She gave him her purse and he took the money in it, which was approximately four or six dollars. He then forced her onto the front floorboard on the passenger side, bound her hands and feet with wire and threatening her with a knife, drove to a point near the ocean. There, defendant pulled and dragged Miss G over a hill and down to the beach.

When she refused to kiss him he removed the wire from her feet and pulled at her blouse, causing her to scream and run. She tried to run away but he caught her and put a wire around her neck. She screamed again, he threatened to kill her unless she was quiet, and he strangled her with his hands. She quieted down and he tore off her clothing and raped her. After he had completed the act, he left her on the beach with her hands loosely bound. She freed and dressed herself, made her way to the highway and eventually notified the authorities. Defendant was apprehended in Miss G's car a few hours later. This incident which took place in San Mateo County is of course not among any of the offenses with which defendant was charged in the Contra Costa County proceedings now before us.

As previously stated (see fn. 2, *ante*) two indictments were returned against defendant: the first (No. 10134) on August 18, 1966, charging 12 counts of felony; and the second (No. 10173) on September 20, 1966, after Miss Collison's death, charging the single count of her murder.

When defendant appeared for entry of his plea to the first indictment, the court suspended the proceedings under section 1368 (doubt as to present sanity) and appointed two psychia-

trists, Dr. Rood and Dr. Perretti, to examine defendant as to his present sanity and report to the court. At the subsequent hearing on the question of present sanity, pursuant to stipulation of the parties, the matter was submitted on the reports of the above two psychiatrists. The court found that the defendant "is presently sane and understands the nature of the proceedings" and ordered that the criminal proceedings be reinstated.

On the same day and before the same judge, defendant appeared for arraignment upon the second indictment. Counsel was appointed to represent him,[7] and upon his motion it was ordered that "up to $350 be provided to the defendant to retain a psychiatrist of his own choosing."

On September 29, 1966, defendant entered pleas to the counts charged in the first indictment. He pleaded not guilty by reason of insanity to all counts[8] and not guilty as to those counts charging him with the various kidnapings and the robbery.[9] In view of the pleas of not guilty by reason of insanity, the court appointed Doctors Rood and Perretti to examine defendant (§ 1027). On the same day and before the same judge, defendant appeared for arraignment upon the second indictment and entered a plea of not guilty by reason of insanity. The above two doctors were similarly appointed to examine defendant in respect to the crime charged in the second indictment. The court thereupon ordered that both proceedings (No. 10134 and No. 10173) be consolidated for the purposes of trial.

On November 14 defendant withdrew all pleas previously entered and entered pleas of guilty as to all counts charged in both indictments. As previously stated the issue of the degrees of the murders was submitted to the trial court on the transcript of the grand jury proceedings. We have examined the transcript and find it to be in accord in all material respects with the factual matters hereinbefore recited. It provides substantial support for the trial court's finding that the murders are of the first degree.

---

[7]The court appointed Mr. Vance Porlier who had already been appointed counsel for defendant in No. 10134 and who has been appointed to represent defendant on this appeal.

[8]Count 4, charging defendant with assault upon Miss Collison with intent to commit murder, was dismissed upon motion of the district attorney. It will be recalled that the second indictment charged defendant with the murder of Miss Collison.

[9]Thus defendant entered only a plea of not guilty by reason of insanity to count one (murder of Miss Box); count three (forcible rape of Miss Box); count seven (forcible rape of Miss W); count nine (sex perversion against Miss S); and count eleven (forcible rape of Mrs. D).

Defendant waived a trial by jury on the issue of penalty raised in both murder counts and in the kidnaping count but the court ordered that a jury be drawn to try said issues. As we have detailed above, defendant was convicted on all counts, sentenced to death on the murder counts and to state prison on the remaining counts. (See fn. 3, *ante*.) This appeal followed.

At the outset we are confronted with defendant's assertion in propria persona that he has a right to dismiss his counsel on appeal (see fn. 7, *ante*) and to proceed in propria persona, and that he has a right to dismiss this appeal. Throughout these proceedings defendant has expressed guilt and remorse concerning the crimes which he freely admits having committed. This has been reflected in the manner in which he has defended, or has refused to defend, against the charges, as is evidenced by his pleas of guilty and his waivers of a trial by jury on the issues of penalty raised in the capital offenses. In furtherance of his professed purpose to accept punishment without what he deems to be unnecessary litigation or delay, he attempted to discharge the counsel appointed for him below. The record discloses that such efforts on defendant's part were not based on any dissatisfaction with any action or conduct of such counsel or with his abilities or skills as an attorney, but instead were predicated upon defendant's desire not to be represented at all.[10] The trial judge advised defendant as to the reasons for the necessity of a trial on the issues of penalty but appears to have been unsuccessful in persuading defendant to that view.[11] Defendant nevertheless

[10]The following took place in chambers before the commencement of trial: "THE COURT: . . . Mr. Stanworth, first, Mr. Porlier [defendant's counsel] has told me that you don't want him to represent you in this matter.
"THE DEFENDANT: That's right, sir.
"THE COURT: Now, as I understand, this is not due to any dissatisfaction with his ability or the manner in which he wishes to handle it.
"THE DEFENDANT: No, that's right.
"THE COURT: It is basically that you don't want to be represented, is that right?
"THE DEFENDANT: That's right."
[11]During the course of the discussion between the trial judge and defendant, defendant expressed his views in the following statements:
"But I just don't understand how—the purpose of this. I mean I pleaded guilty; I confessed. I'll even give you my life. I'll sign my own death warrant. I just want to keep all this garbage out of the papers."
"I would like to plead no contest and have no witnesses whatsoever on my behalf. I don't want Mr. Porlier to cross-examine and I don't want him to have any jurisdiction over the pick of the jury. I don't want nothing in my behalf."
"I just feel that being the sole purpose of this hearing is to decide

cooperated throughout the trial proceedings and thereafter seemed to accept, if grudgingly, the representation of his counsel.

Defendant initially requested and consented to our appointment on January 19, 1967, of counsel to represent him on this appeal but almost immediately sought by one means or another to frustrate the appeal. On February 13 he purported by letter to "waive this appeal";[12] in a letter dated March 6 he asked that the court dismiss his counsel and permit him to proceed in propria persona; in a letter dated March 13 he urged us to take action on his prior requests, citing authority claimed to support his right to dismiss counsel but, by implication at least, recognizing that he might not have the right to dismiss an automatic appeal.[13] Nevertheless, on June 15 defendant filed herein a "Voluntary Abandonment of Appeal" in the language of and otherwise conforming to rule 38, California Rules of Court. That rule provides in pertinent part that an "appellant may dismiss his appeal at any time by filing an abandonment thereof, signed by him or his attorney of record." We thereupon requested that opposing counsel submit briefs directed to the question of whether an appellant may request abandonment or dismissal of an automatic appeal. In response to that request defendant instructed

---

whether it's life or death, and I just don't feel these things just can't die with me, and I don't feel how there can be any benefit gained out of any of this.''

[12] In his communication to the court, he stated, inter alia: "I would like to waive this appeal, and let the all ready [sic] standing decision, remain as is. Should this not be possible, I want the court to handle my brief in a perfunctory fashion and then affirm my case, because I do not want a reversal or any other form of legal or technical formalities, to hold up my decision any longer than necessary.

"It would save the court much time and trouble if you could PLEASE grant me this request and it would save me many months of useless existence here on Death Row. Any action you would take in this direction would be deeply appreciated. Many thanks for your time.''

[13] Excerpts from this communication are as follows: "I know that I will never see the freedom of the outside world again, I have dishonored my family's name not to mention the pain and agony to myself and my wife. . . . I wish to cause no more expense to the state with legal fees and costs- of housing. I cannot describe the feeling that I have but I know that you will understand my requests. It seems now that I must insist that this Court give me the action that I seek, namely that this Court dismiss my appointed counsel . . . and dismiss the briefs filed in my behalf. . . . I understand that I and I alone must suffer for my acts and I understand also that the law holds me to task for my actions. I cannot continue living with cloud over my head, please be merciful and give me an endless sleep as soon as you can so this pain and suffering that I have will be no more. . . . I hope that you will understand that I want no re-trial, no penalty trial or any favorable action from this Court all I want, is to die.''

his counsel either to submit a brief supporting defendant's position that he can dismiss the appeal, or to step aside.[14] Defendant also addressed a communication to the Attorney General enclosing an "Affidavit of Verification" and urged that it be utilized by the People in preparing their brief. The document stated: "I DENNIS STANWORTH hereby swear that the conviction which has resulted in the sentence of death is valid. I also swear that no violation of my constitutional rights has taken place; and if any have I waive those rights. I stipulate that the record of my trial is valid and the contentions of the respondent are true and that the contentions as put to this court in my briefs have no merit." Opposing counsel have submitted their briefs as requested, both ignoring defendant's communications to them.

On June 30, 1967, defendant submitted a further document to this court purporting to be in response to our above-mentioned request for briefs and representing that he had discharged his counsel. We construed the document to constitute not only a brief directed to the question of defendant's right to dismiss this appeal but also, together with the purported "Abandonment of Appeal," to constitute a motion to dismiss counsel appointed for him by this court. On July 12 we made an order denying defendant's motion to dismiss his counsel. Since that date defendant has communicated with us on additional occasions and, we are advised, has communicated with the State Bar complaining that his counsel has failed to act in defendant's best interests.

We hasten to point out that there is nothing in the record before us, either upon an examination of the trial court proceedings, the briefs on appeal, or other matters that have been directed to our attention, which even suggest that counsel has conducted the trial or appeal in defendant's behalf in other than a competent, professional and skillful manner, always to

---

[14]In this communication to his counsel, defendant states in part: "I know all that stands between this motion being granted or denied is your brief, so I am now telling you that either you state that I have the right to an abandonment of appeal under Rule 38 of the California Rules of Court (or to that effect), or I want you *off* my case.

"I am getting awfully tired of you denying me my rights (Constitutional Amendment. VI) of *adequate representation by counsel,* when you continually refuse to represent me as I deem appropriate.

"So, either you state the facts as I have stated them or draw up a motion and submit it to the Supreme Court, stating that you have been officially dismissed and wish to withdraw from the case, and that you cannot submit any briefs in this matter because in so doing you would be going against your client's best interests and be doing him a grave injustice."

the end of relieving defendant of the consequences of the crimes charged. Counsel's task has been particularly difficult in view of defendant's attitudes and opposition, as expressed at various times, and he has shown great patience and restraint in continuing to represent defendant in an objective manner. We are unable to discern that defendant has any complaint other than that he is *represented*, and we would be less than objective if we were to conclude that his purpose in obtaining other representation or in representing himself was anything other than to frustrate the relief, if any, to which he might be entitled pursuant to this appeal.[15]

■ Directing our attention first to defendant's claimed right to dismiss an appeal taken in a death penalty case, we can find no statute or rule of court making express provision for the right which defendant now asserts. Section 1239, subdivision (b) provides: "When upon any plea a judgment of death is rendered, an appeal is automatically taken by the defendant without any action by him or his counsel." The appeal is thus taken without any affirmative action by a defendant, or even his consent thereto. Furthermore the statutory scheme contemplates, if it does not explicitly direct, the review of death penalty cases by this court. Thus, section 1217 requires that one convicted of a capital crime be held at the state prison "pending the decision upon his appeal," and section 1193 provides that the trial court fix the date of execu-

[15]Although defendant has persisted in the view that he should suffer the penalty imposed, there is nothing in the record or in his various communications which suggests that he is legally insane or entitled to relief on some theory of diminished capacity. (See *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911].) Doctors Rood and Perretti, who examined defendant pursuant to section 1368, both stated he was sane. Dr. Rood stated in pertinent part: "Mentally, he is alert, communicative and of normal mood and intelligence. He is usually objective and dispassionate in reciting his offenses, but becomes somewhat tense when discussing the murders. He shows no disintegration or loosening of his thought-emotional-reality mental organization. He is without hostility or paranoidal attitude in the interviews, trying to be as factual and memory-accurate as possible. He recognizes the abnormality of his obsessions and sexual desires, but he also sees that he knew the wrongfulness of his behavior, . . . He also knew and understood the nature, quality and wrongfulness of his behavior. His problem was not in the area of knowledge and understanding, but in the area of self-control in the face of abnormal sexual predispositions from nonpsychotic personality disorder. . . . He is (and was at the time) sane and responsible, mentally competent to stand trial, and not committable under Section 1368 of the Penal Code." Dr. Perretti's report is to the same effect.

The same doctors were also appointed to examine defendant pursuant to his pleas of not guilty by reason of insanity. In that report Dr. Perretti stated, inter alia: "It is my conclusion that Dennis Stanworth, at the time of the offense, was legally sane and he did not have at that time any mental symptoms of psychosis. It is my opinion that on that

tion after a judgment imposing the death penalty "has been affirmed by the appellate court."

In construing the statutory provisions relating to an appeal in the case of one convicted of a capital offense, we have held that subdivision (b) of section 1239 imposes a duty upon this court "to make an examination of the complete record of the proceedings had in the trial court, to the end that it be ascertained whether defendant was given a fair trial. . . ." (*People* v. *Perry* (1939) 14 Cal.2d 387, 392 [94 P.2d 559, 124 A.L.R. 1123].) We said in *People* v. *Bob* (1946) 29 Cal.2d 321 [175 P.2d 12]: "The Legislature of California has taken extraordinary precaution to safeguard the rights of those upon whom the death penalty is imposed . . . , by providing for an automatic appeal . . . *and enjoining upon this court* an examination of the record and the preparation of a formal opinion and decision from which it should appear that no miscarriage of justice has resulted." (Italics added.) (29 Cal.2d at p. 328; see also *People* v. *Figueroa* (1911) 160 Cal. 80, 81 [116 P. 391].)

It is manifest that the state in its solicitude for a defendant under sentence of death has not only invoked on his behalf a right to review the conviction by means of an automatic appeal but has also imposed a duty upon this court to make such review. We cannot avoid or abdicate this duty merely because defendant desires to waive the right provided for him. In other contexts it has been held that a defendant's waiver or attempted waiver of a right is ineffective where it would involve also the renunciation of a correlative duty imposed upon the court. Thus in *People* v. *Werwee* (1952) 112 Cal. App.2d 494 [246 P.2d 704], where a defendant purported to consent that a jury could be separated after commencing its deliberations, the court stated: "If it should be contended

occasion, Dennis Stanworth was aware of the nature, quality and consequences of his acts; and that he then had knowledge and understanding of the wrongfulness of his acts. Dennis Stanworth did not have delusions, and was not having hallucinations at the time of the offense, and was not psychotic. . . . He was legally sane, without psychosis, at the time of his offense." Dr. Rood's report at that time was to the same effect as that of Dr. Perretti.

Dr. Rood also testified in behalf of the defendant at the penalty trial. He stated that defendant had developed "an abnormal sexual inclination or attitude in the sense of being predisposed, abnormally predisposed, to sexual obsessions, sexual involvement with the physically mature female." He described defendant as having an "abnormality of behavior as against any abnormality of knowing or understanding." The doctor also testified that defendant was sane at the time of the commission of the murders, and that he was mentally able to understand the charges and cooperate rationally in his defense.

that a defendant under such circumstances waived his right to claim irregularity in the separation of the jury by consenting to it, our answer would be that he could not waive the right to have the statutory procedure observed.'' (P. 499.) The court continued: ''Although a defendant may waive rights which exist for his own benefit, he may not waive those which belong also to the public generally.'' (P. 500.) In *People* v. *Blakeman* (1959) 170 Cal.App.2d 596 [339 P.2d 202], the court held that a defendant could not be deemed to have waived the invalidity of a condition upon which probation had been imposed, reasoning: ''The fallacy of this argument is that we are not dealing with a right or privilege conferred by law upon the litigant for his sole personal benefit. We are concerned with a principle of fundamental public policy. The law cannot suffer the state's interest and concern in the observance and enforcement of this policy to be thwarted through the guise of waiver of a personal right by an individual. 'Any one may waive the advantage of a law intended for his benefit. But a law established for a public reason cannot be contravened by a private agreement.' (Civ. Code, § 3513.)'' (P. 598.)

We therefore hold that, contrary to defendant's assertions, rule 38 has no application to an automatic appeal. That rule is addressed to a situation where a party, having the absolute right to forego an appeal in the first place, retains a coextensive right to dismiss it at any time for any reason or for none at all. On the contrary, a defendant under judgment of death does *not* have an *election* to take or forego an appeal. As we have explained, that right has been denied him by the operation of section 1239 subdivision (b). In short, a proceeding pursuant to subdivision (b) is not an *appellant's* appeal in the ordinary sense of rule 38. It is not entirely ''his appeal,'' since the state, too, has an indisputable interest in it which the appellant cannot extinguish. Accordingly, defendant's application to dismiss the instant appeal must be denied.

There remains the further question whether defendant is entitled to dismiss or secure the discharge of his counsel appointed to represent him on this appeal. One who is an indigent is constitutionally entitled to be represented by counsel on appeal from a judgment upon a criminal conviction. (*Douglas* v. *California* (1963) 372 U.S. 353 [9 L.Ed.2d 811, 83 S.Ct. 814].) This right, like other constitutional rights, may be waived by a defendant. (*Johnson* v. *Zerbst* (1938) 304 U.S. 458 [82 L.Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357].) ''The determination of whether there has been

an intelligent waiver of counsel involves a consideration of the nature of the charge, the facts and circumstances of the case, and the education, experience, mental competence and conduct of the accused. [Citations.]'' (*People* v. *Chesser* (1947) 29 Cal.2d 815, 822 [178 P.2d 761, 170 A.L.R. 246]; *In re James* (1952) 38 Cal.2d 302, 313 [240 P.2d 596].)

 In the instant case the record fairly establishes that defendant is competent and well oriented to the situation in which he finds himself. However, those are not the only factors which we must consider. Not only is defendant's life at stake as a result of his conviction of two counts of murder, but it is all too plain to us that his intentions are to defeat the very purpose of appellate review in order that he may suffer, as quickly as possible, the penalty imposed upon him in the trial court. In such circumstances, defendant's *refusal* to act to extricate himself from the threat of death must be deemed the equivalent of an *inability* to do so, and he is not entitled to proceed in propria persona. This is not to say that defendant would not be entitled to replace his counsel on a showing that such counsel refused to act or to cooperate reasonably in the effort to relieve defendant of the penalties imposed. Although defendant has complained that counsel refuses to act as directed and instructed, he has rejected our request for specific details,[16] and defendant's complaint appears to be only that his counsel insists on seeking out and asserting error in the trial proceedings, rather than sit idly by and do nothing. We are satisfied that under the prevailing circumstances defendant's best interests require the assistance of counsel. His motion to dismiss counsel was properly denied and, assuming it to be renewed, must again be rejected.

 Proceeding to the merits, we have concluded that under the compulsion of *Witherspoon* v. *Illinois* (1968) 391

---

[16]In the communication in which he rejected our request the following appears: ''Below you will find a statement of facts which I consider to be crucial and important evidence.

''A STATEMENT OF FACTS FOR THE RECORD

''The fact is, I did it and I am guilty as charged and there is no doubt to that fact. I had a fair and impartial trial and swear that the conviction which has resulted in the sentence of death is valid. I also swear that no violation of my constitutional rights has taken place; and if so I waive those rights. I stipulate that the record of my trial is valid and the contentions of the district attorney are true and that the contentions as put to this court in my briefs have no merit.

''That it would be a travesty to justice to reverse a decision where there is no question as to the guilt of the person and that same person has said many times that he had a fair trial. Anything else that enters into the picture (such [as] my counsel's briefs) is irrelevant and immaterial.''

U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], we must reverse the judgment insofar as it relates to the penalty imposed for each of the murder counts for the reason that certain prospective jurors were excused for cause in violation of the standards expounded by the United States Supreme Court in that case.

*Witherspoon* states that a defendant in a capital case is entitled to have his penalty determined by a jury which is selected in such a manner that it expresses "the conscience of the community on the ultimate question of life or death." (391 U.S. at p. 519 [20 L.Ed.2d at p. 783].) In order to insure that persons who merely voice opposition to the death penalty are not excluded from the jury, the Supreme Court has ruled that a venireman may not be excused for cause unless he makes it "unmistakably clear . . . that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the 522, fn. 21 [20 L.Ed.2d at p. 785].)

In the case at bench twelve prospective jurors were excused for cause as a result of their conscientious opinions with respect to the death penalty. (See § 1074, subd. 8.) We deem it necessary to discuss only three of the twelve. Of these three, two veniremen, Mr. Muldoon and Mr. Moore, indicated on *voir dire* examination that they did not believe in the death penalty and they were excused without further questioning.[17] *Witherspoon* itself involved six veniremen who were excused for cause when they indicated that they did not "believe in the death penalty." (391 U.S. at p. 514 [20 L.Ed.2d at pp. 780-781].) The court held that it was error to excuse them without determining whether they could nevertheless return a verdict of death because, "It is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to

---

[17]The complete *voir dire* of Mr. Muldoon was as follows:

"By Mr. HATZENBUHLER [prosecuting attorney]: Q. Mr. Muldoon, as you sit there, sir, do you have any opinion for or against the death penalty that would prevent you from being an impartial juror, fair and impartial juror?

"A. Yes, sir.

"Q. And what is that opinion, sir?

"A. I don't believe in the death penalty. I don't——

"Mr. HATZENBUHLER: Challenge for cause, Your Honor.

"THE COURT: Do you want to ask any questions, Mr. Porlier?

"Mr. PORLIER [defense counsel]: No, Your Honor.

"THE COURT: All right, you will be excsued [*sic*], Mr. Muldoon. Thank you for coming this morning and being so candid with us."

Mr. Moore was examined as follows:

"By Mr. HATZENBUHLER: Q. Mr. Moore, as you sit there now, do you

what he perceived to be his duty to abide by his oath as a juror and to obey the law of the state." (391 U.S. at pp. 514-515, fn. 7 [20 L.Ed.2d at p. 781].) Since Mr. Muldoon and Mr. Moore indicated only that they did not believe in the death penalty they could not properly be excused for cause without it having been determined that their beliefs would prevent them from ever voting to impose death. Inasmuch as that determination was not made it was error for the trial court to have granted the prosecution's challenge for cause.[18]

Prospective juror Eloise Whipple indicated on *voir dire* that she did not believe she "would want to return a death penalty," and she was excused for cause without further examination.[19] Mrs. Whipple's statement indicates a lack of desire on her part to undertake the responsibility incident to a determination of the proper penalty to be imposed on defendant. We recognize that it is at best an unpleasant task to determine whether a man should live or die and that when given the choice most people would not want to assume that burden. However, the mere fact that a venireman may find it unpleasant or difficult to impose the death penalty cannot be equated with a refusal by him to impose that penalty under any circumstances. ■ "Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." (391 U.S. at p. 516, fn. 9 [20 L.Ed.2d at pp. 781-782].)

■ *Witherspoon* requires, for the proper exclusion of a venireman, an absolute refusal on his part to consider the imposition of the death penalty, and Mrs. Whipple's statements clearly did not bring her within that standard. She

have a state of mind that would prevent you from being fair to both The People and to the defendant in this case?
"A. Well, I don't believe in the death sentence.
"Mr. Hatzenbuhler: Challenge for cause, Your Honor.
"The Court: Do you want to ask any questions, Mr. Porlier?
"Mr. Porlier: None, Your Honor.
"The Court: All right, Mr. Moore, you may be excused. Thank you very much for coming this morning and for being so candid with us."

[18]We, of course, intimate no criticism of the trial court since the instant case was tried prior to the time the decision was announced in *Witherspoon*. By the same reasoning we reject the Attorney General's argument that the failure of defense counsel to object to the dismissal of veniremen for cause should preclude defendant from enjoying the benefits of *Witherspoon* on this appeal.

[19]The complete *voir dire* examination of Mrs. Whipple was as follows:
"The Court: Mrs. Whipple, from where you sat in the courtroom could you hear the nature of the issue we are here to decide today?
"Juror No. 9: Yes.
"The Court: Is there anything that you have heard in this courtroom

therefore was erroneously excused for cause. Under the rules announced in *Witherspoon* the judgment must be reversed insofar as it relates to the penalty imposed for each of the murder counts.

Since the issue of penalty must be retried, we proceed to consider certain contentions of defendant for the guidance of the court on retrial.

 It is contended that two photographic exhibits showing views of the nude body of Susan Muriel Box, were erroneously admitted in evidence over defendant's objections. The basis for the objections and claim of error is that in view of the plea of guilty and the finding of first degree murder, the photographs had meager probative value in the trial on the issue of penalty when weighed against the prejudicial effect claimed to have necessarily resulted upon their examination by the jury.

We have examined the photographs. One of them depicts the position of Miss Box's body as she was discovered under the large bush. The body lies face down and the photo displays her legs, buttocks, a portion of her back and her left arm which is twisted up over her back. The second photo shows Miss Box lying on her back at the morgue. The upper portion of her head with the fatal wound is not visible, but there are visible numerous other wounds over her body, legs and arms, including the wounds caused by the bullet which traversed her right thigh and entered her abdomen. The second photograph also shows the puncture wound in her chest. No claim is made that the photos were introduced in an untimely manner, were unreasonably displayed, or were unduly sensational.

 Whether "the probative value of photographs offered into evidence outweighs the possible prejudicial effect is a question for the trial court in the exercise of its judicial discretion." (*People* v. *Harrison* (1963) 59 Cal.2d 622, 627 [30 Cal.Rptr. 841, 381 P.2d 665]; see also *People* v. *Sanchez* (1967) 65 Cal.2d 814, 828 [56 Cal.Rptr. 648, 423 P.2d 800], remittitur recalled, revd. on other grounds, *People* v. *Sanchez* (1969) 70 Cal.2d 562 [75 Cal.Rptr. 642, 451 P.2d 74]; *Peo-*

---

today that makes you feel you could not be a proper juror in this case?
"JUROR No. 9: Yes, sir. I don't believe I would want to return a death penalty.
"THE COURT: Do you wish to ask any questions, Mr. Hatzenbuhler?
"MR. HATZENBUHLER: Challenge for cause, Your Honor.
"THE COURT: Mr. Porlier?
"MR. PORLIER: No questions, Your Honor.
"THE COURT: All right, you may be excused, Mrs. Whipple. Thank you for coming this morning and for being so candid with us."

*ple* v. *Mathis* (1965) 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65] ; *People* v. *Henderson* (1963) 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677].) Although the claimed errors occurred during the penalty as distinguished from the guilt phase, the question of impropriety is to be resolved by the same principles. (*People* v. *Jones* (1959) 52 Cal.2d 636, 647 [343 P.2d 577].) In the *Jones* case we held with respect to the penalty phase of the trial for a capital crime: "It would appear that the new section embodies the broad, liberal rule on admission of evidence that has always existed where a defendant has pleaded guilty and the only issues being tried relate to the degree of the crime and the penalty to be imposed. In such cases wide leeway in the admission of evidence is permitted. [Citations.] If there are any limitations on the admission of such evidence, it is certainly the rule that if the evidence would have been admissible on the trial of the guilt issue, it is admissible on the trial aimed at fixing the penalty." (52 Cal.2d at p. 647; see also *People* v. *Tahl* (1967) 65 Cal.2d 719, 728 [56 Cal.Rptr. 318, 423 P.2d 246].)

In support of his claim of error, defendant relies upon *People* v. *Hines* (1964) 61 Cal.2d 164 [37 Cal.Rptr. 622, 390 P.2d 398], wherein, after holding that a defendant could not claim error on appeal because he failed to object to the introduction of photographs at trial, we stated that in view of the fact "that defendant admitted his guilt and described the circumstances of the crime, we see no probative value in the photographs which would outweigh their prejudicial effect." (Pp. 173-174.) The nature of the photographs in that case are not described beyond defendant's allegation that they were "gruesome." As indicated, we cannot fairly describe the photographs in the instant case in similar terms. Moreover, it appears from *Hines* that the defendant had "described the circumstances of the crime," thus making the photographic evidence merely cumulative to other evidence then before the jurors. In the instant case the details of what took place at the murder scene are not at all clear. The record contains no direct evidence explaining the puncture wound in Miss Box's chest, the numerous scratch marks over her body, arms and legs, or the twisted position of her left arm. Such matters are clearly relevant to the issues of the aggravation of the crime and penalty. The photographs constitute the most accurate evidence of these matters and lend clarity to the testimony of doctors who testified in connection therewith. (*People* v. *Sanchez, supra,* 65 Cal.2d 814, 828, remittitur

recalled, revd. on other grounds, *People* v. *Sanchez, supra,* 70 Cal.2d 562.)

As we have explained, the photographs are not in any manner shocking to the senses and constitute relevant and material evidence, having substantial probative value in the resolution of issues on the penalty phase. When such probative value is weighed against the prejudice, if any, which may have resulted to defendant, we are compelled to conclude that on the record now before us no abuse of discretion is indicated in the necessary determination by the trial court in favor of receiving the photos. (*People* v. *Harrison, supra,* 59 Cal.2d 622, 627.)

Defendant next contends that the court failed to fully instruct the jury that evidence of other crimes committed may not be considered as evidence unless proved beyond a reasonable doubt. In *People* v. *Terry* (1964) 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381], we stated: "Furthermore, in the penalty trial the same safeguards should be accorded a defendant as those which protect him in the trial in which guilt is established. In *People* v. *Hamilton, supra,* at page 129 [*People* v. *Hamilton* (1963) 60 Cal.2d 105 (32 Cal.Rptr. 4, 383 P.2d 412)] we held that if the prosecution attempts to prove prior crimes, the defendant is entitled to the protection of the rule which prohibits the admission of a confession until the corpus delicti has been proved. As a corollary, defendant should not be subject to a finding of a jury that he commited prior crimes unless his commission of such prior crimes has been proven beyond a reasonable doubt." (61 Cal.2d at p. 149, fn. 8.) It is now settled that a defendant during the penalty phase of a trial is entitled to an instruction to the effect that the jury may consider evidence of other crimes only when the commission of such other crimes is proved beyond a reasonable doubt. (See *People* v. *Varnum* (1969) 70 Cal.2d 480, 485-486 [75 Cal.Rptr. 161, 450 P.2d 553]; *People* v. *Hillery* (1967) 65 Cal.2d 795, 805 [56 Cal.Rptr. 280, 423 P.2d 208]; *People* v. *Mitchell* (1966) 63 Cal.2d 805, 817 [48 Cal. Rptr. 371, 409 P.2d 211]; *People* v. *Polk* (1965) 63 Cal.2d 443, 450-451 [47 Cal.Rptr. 1, 406 P.2d 641].)

The specific other crimes to which defendant's contention has reference, are not designated. Aside from the capital crimes for which the penalties were to be fixed, the prosecution submitted evidence as to the incidents involving Miss W, Miss S, Mrs. D and Miss G. In each instance compelling testimony of defendant's guilt was received without refutation, and these matters were confirmed in large part by

defendant's confessions. Although the prosecution submitted no other direct evidence of crimes, incidental references were made to matters which might constitute other crimes.

Defendant did not request the instruction here under consideration. ■■■ Nevertheless, "the court has a duty to give instructions on the general principles of law governing the case, even though not requested by the parties, . . ." (*People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116]; see also *People* v. *Warren* (1940) 16 Cal.2d 103, 117 [104 P.2d 1024].) Although such a duty does not always extend to include instructions upon specific points developed at the trial through evidence (*People* v. *Jackson* (1963) 59 Cal.2d 375, 380 [29 Cal.Rptr. 505, 379 P.2d 937]), an instruction has been required if "it is vital to a proper consideration of the evidence by the jury" (*People* v. *Putnam* (1942) 20 Cal.2d 885, 890 [129 P.2d 367]) or if necessary "for the jury to be fully and fairly charged upon the relevant law" (*People* v. *Jackson, supra,* 59 Cal.2d 375, 380). We have distinguished those "specific points developed at the trial" which do not require an instruction in the absence of a request therefor by defining "general principles of law" on which instructions on the court's own motion are required as "those principles of law commonly or closely and openly connected with the facts of the case before the court." (*People* v. *Wade, supra,* 53 Cal.2d 322, 334; see also *People* v. *Jackson, supra,* 59 Cal.2d 375, 380; *People* v. *Bevins* (1960) 54 Cal.2d 71, 77 [4 Cal.Rptr. 504, 351 P.2d 776].)

■■■ The case then before the court was, as noted, a penalty trial wherein the issue of guilt had been already adjudicated. In resolving the sole issue before it, the trier of fact could consider only evidence "of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty." (§ 190.1) ■■■ Where the prosecution submits substantial evidence of other crimes as bearing on the penalty for the particular crime or crimes charged, such evidence cannot be deemed to bear only on a "specific point developed at the trial" but instead bears heavily on "those principles of law commonly or closely and openly connected with the facts of the case before the court." (*People* v. *Wade, supra,* 53 Cal.2d 322, 334.) Instructions on how the jury may utilize such evidence, including an instruction that it may consider only those crimes proved beyond a reasonable doubt, are therefore vital to a proper consideration of the evidence, and the court should so instruct *sua sponte.*

■ Finally, we deal with an erroneous instruction that the prosecutor with commendable candor has called to our attention. In the course of a general instruction on the province and function of the jury[20] the court stated: "The law forbids you to be governed by sentiment, conjecture, sympathy, passion, prejudice, public opinion, or any other factor other than the evidence and the law." It is error to instruct the jury in the penalty phase of the trial that it cannot be governed or influenced by pity or sympathy for the defendant. (*People v. Polk, supra,* 63 Cal.2d 443, 451; *People v. Anderson* (1966) 64 Cal.2d 633, 641 [51 Cal.Rptr. 238, 414 P.2d 366].)

Defendant's purported applications to dismiss the appeal and his application to dismiss his counsel are, and each of them is, denied. The judgment is reversed insofar as it relates to the penalty imposed for each of the murder counts; in all other respects the judgment is affirmed.

Traynor, C. J., Peters, J., and Tobriner, J., concurred.

McCOMB, J.—I would affirm the judgment in its entirety. (Cal. Const., art. VI, § 13.)

MOSK, J.—I concur in the judgment and agree with the views expressed except as to the dictum added "for the guidance of the court on retrial."

As discussed in my dissent in *People v. McClellan* (1969) *ante,* p. 793 [80 Cal.Rptr. 31, 457 P.2d 871], it is not, and should not be, the law at the penalty proceeding after the defendant has been found guilty that evidence of other crimes must be proved beyond a reasonable doubt. I would return this court, and trial courts, to the course charted by the Legislature, which provided in Penal Code section 190.1 as clearly and simply as words can express it that the trier of fact at the penalty proceeding is to consider "the defendant's background and history, and . . . any facts in aggravation or mitigation of the penalty." No matter how often I read that code section, I have yet to discover in it a limiting qualification. *Any facts* would seem to mean *any facts.*

Burke, J., concurred.

---

[20]In language almost identical to that found in the third paragraph of CALJIC No. 1 prior to its revision.