Filed 10/22/24 Certified for Publication 11/8/24 (order attached)
*See dissenting opinion*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| ENRIQUE SANCHEZ, | |
| Petitioner, | E083015 |
| v. | (Super.Ct.No. FSB23000105) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of mandate. Rodney A. Cortez, Judge. Petition denied.

Thomas W. Sone, Public Defender, Edward O'Brien and Timothy R. Douglass, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

1

Jason Anderson, District Attorney; and Philip Stemler, Deputy District Attorney for Real Party in Interest.

## I.  INTRODUCTION

In this writ proceeding, defendant and petitioner Enrique Sanchez seeks a writ of mandate ordering respondent superior court to vacate its order directing the San Bernardino County Public Defender (public defender) to assign a new attorney from its office to represent petitioner in his criminal proceedings.  The trial court issued the order after receiving evidence that the deputy public defender currently assigned to represent him made remarks invoking defendant's race as a factor to consider during plea negotiations, potentially in violation of the Racial Justice Act (RJA) (Pen. Code,[1] § 745).  We conclude that petitioner has failed to establish an abuse of discretion warranting reversal of the trial court's order under the circumstances presented in this case.  As such, we deny the petition.

## II.  BACKGROUND

In October 2023, the People filed an information alleging petitioner committed multiple criminal offenses arising out of an incident that occurred on January 7, 2023.  The public defender was appointed as defendant's counsel and a specific deputy public defender from its office (deputy public defender) was assigned to handle defendant's case.

---

[1]  Undesignated statutory references are to the Penal Code.

On December 4, 2023, the prosecutor filed a "Motion to Disclose Exculpatory Evidence to Defendant & Evaluate [deputy public defender's] Conflict of Interest." The motion was accompanied by a declaration from a prosecutor, stating that she engaged in a plea negotiation with the deputy public defender and, in the course of that negotiation, the deputy public defender became frustrated and stated: " 'I really don't care.' . . . [R]ead between the lines . . . . I am a white man. What do I care? It's not my people we are incarcerating.' " When the prosecutor asked for clarification about the remarks, the deputy public defender stated that he expected the prosecutor to show more leniency because the prosecutor and defendant appeared to be the same race, stating: " '[Y]ou are part of the problem. Look around you, all the people being incarcerated are your people. I will just look like a mean defense attorney. You should be part of the solution.' " Based upon this exchange, the prosecutor requested that the deputy public defender's remarks be disclosed to petitioner and that the trial court evaluate whether a conflict existed requiring removal of the deputy public defender from petitioner's representation in this matter.

On December 12, 2023, the trial court held a closed hearing outside the presence of the public and any attorneys representing the San Bernardino County District Attorney. Petitioner was present, accompanied by the deputy public defender, as well as a second attorney from the public defender's office. During the hearing, the trial court directed that the prosecutor's declaration be read to petitioner on the record and requested that petitioner indicate whether he wanted the public defender and the specific deputy public defender identified in the declaration to continue representing petitioner.

3

Defendant expressed his desire that the public defender and deputy public defender assigned to his case continue to represent him. The transcript of the hearing does not disclose that petitioner was notified of any potential conflict of interest or potential claim for relief under the RJA. Nor does the transcript of this hearing reflect that petitioner offered to enter a waiver of any conflict or any claims.

On December 27, 2023, petitioner filed an opposition to the prosecutor's motion, suggesting that the prosecution's motion was filed in retaliation for the deputy public defender's threat to file a motion to recuse the prosecutor in the case. Petitioner submitted the declaration of the deputy public defender, who acknowledged participating in plea negotiations with the prosecutor but disputed that he used certain phrases and words during these discussions. The deputy public defender did not dispute that he made the comment: "I'm just a white guy; why should I care?" and did not dispute that he urged the prosecutor to consider defendant's race in considering her plea offer. Instead, the deputy public defender explained that his comment was made "sarcastically" and that his only intent was to pursue petitioner's best interests.

On January 4, 2024, the trial court held a hearing on the prosecutor's motion. After entertaining argument, the trial court ordered that (1) the public defender's office assign a new attorney to handle defendant's case, and (2) the public defender take steps to isolate any persons who have worked on defendant's case thus far from further involvement in the case. In making its order, the trial court concluded that the deputy public defender assigned to defendant's case made comments that "at least trigge[r] the potential of an issue with the Racial Justice Act"; the failure to raise such a claim could

4

potentially constitute ineffective assistance of counsel; any appointed appellate counsel would be bound to investigate and raise the claim in a future proceeding; and that it would be reasonable to take steps to avoid this necessity in future proceedings.

On January 16, 2024, defendant filed a petition for writ of mandate requesting that we direct the trial court to vacate its order. We ordered a stay of the trial court proceedings and invited respondent and real party in interest to file an informal response.[2] On February 27, 2024, we issued an order to show cause, and the parties elected to submit supplemental briefing on the matter in lieu of a formal return and traverse.

### III. DISCUSSION

A. *General Legal Principles, Standard of Review, and Issues Presented*

Mandate is an appropriate method to seek review of "[o]rders concerning the designation or substitution of appointed counsel . . . ." (*Drumgo v. Superior Court of Marin County* (1973) 8 Cal.3d 930, 933 (*Drumgo*).) Indeed, "a promptly filed writ petition normally provides the only effective remedy for an erroneous replacement of appointed counsel because of a potential conflict of interest." (*People v. Noriega* (2010) 48 Cal.4th 517, 525, fn. 1 (*Noriega*); *People v. Phillips* (1985) 169 Cal.App.3d 632, 639 [petition for an extraordinary writ before trial is the "timely procedural avenue[e]" to provide a remedy for erroneous replacement of counsel].)

---

[2] On February 9, 2024, "the People of the State of California" was listed as the real party in interest to this petition.

5

"Generally, it is either the defendant or his counsel who requests the removal of counsel." (*People v. Cole* (2004) 33 Cal.4th 1158, 1187 (*Cole*).) However, "[c]ounsel may also be relieved on the trial court's own motion, over the objection of the defendant or his counsel" (*ibid.*), or at the urging of the prosecution (*People v. Avila* (2009) 46 Cal.4th 680, 694). " '[T]he trial court's removal of counsel is reviewed for abuse of discretion.' " (*Magana v. Superior Court* (2018) 22 Cal.App.5th 840, 858 (*Magana*); *Drumgo*, *supra*, 8 Cal.3d at pp. 934-935 ["The appointment of counsel to represent an indigent rests . . . in the sound discretion of the trial court . . . ."].) However, "[t]he abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712; *People v. Thai* (2023) 90 Cal.App.5th 427, 433; *People v. Smyth* (2024) 99 Cal.App.5th 22, 27.)

With respect to a decision to remove appointed counsel, the California Supreme Court has unambiguously held that "[a] defendant who requires appointed counsel does not have a constitutional right to a counsel of choice" and, as a result, there is no violation of the federal or state constitution simply because a trial court orders the removal of appointed counsel over a defendant's objection.[3] (*People v. Thomas* (2012)

---

[3] We note here that the trial court's order was narrowly tailored to remove only the deputy public defender who is the subject of the accusation of a potential violation of the RJA, not the Public Defender, who is also counsel of record for the defendant, nor the entire public defender's office.

54 Cal.4th 908, 924; *Noriega*, *supra*, 48 Cal.4th at pp. 522-524; *People v. Clark* (2011) 52 Cal.4th 856, 994, fn. 41 (*Clark*) ["a defendant has no right to appointed counsel of choice, under the . . . Sixth Amendment, or any other constitutional guarantee"].) Instead, the trial court has discretion to remove counsel " 'to eliminate potential conflicts, ensure adequate representation, or prevent substantial impairment of court proceedings,' " (*Cole*, *supra*, 33 Cal.4th at p. 1187; *People v. Panah* (2005) 35 Cal.4th 395, 426; *People v. Muniga* (2008) 44 Cal.4th 1101, 1119 (*Muniga*)); although the proper exercise of discretion will also include consideration of whether a defendant's choice of counsel can be reasonably accommodated under the circumstances (*People v. Woodruff* (2018) 5 Cal.5th 697, 728-729).

Given this well-settled authority, petitioner's arguments that (1) the trial court's order violated his constitutional right to counsel; (2) the trial court could not remove counsel absent evidence of an actual conflict; and (3) that there is no authority for removal of counsel based upon a potential conflict of interest are all without merit. As such, we need not discuss these arguments in detail, and we proceed to evaluate whether petitioner has shown an abuse of discretion warranting reversal of the trial court's order. As we explain, the record does not support such a conclusion.

B. *The Trial Court Did Not Abuse Its Discretion in Removing Defense Counsel*

Here, petitioner concedes that the trial court's decision to remove counsel was motivated in large part on the desire to insulate the criminal proceedings from issues arising under the RJA. However, because the RJA is "novel in concept and expansive in scope" (*Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 828), the impact of its

7

provisions have yet to be fully applied or understood in the numerous contexts that the statute may apply. Thus, the trial court's exercise of discretion in this case must be viewed in the context of the unique issues raised by the RJA that may have little parallels to issues considered in established case law.

1. The RJA, Generally

The RJA, "effective January 1, 2021, added section 745 to the Penal Code. The Legislature enacted the [RJA] with the express intent 'to eliminate racial bias from California's criminal justice system' and 'to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.' " (*Mosby v. Superior Court* (2024) 99 Cal.App.5th 106, 123.) As written, the RJA includes a mandatory provision providing that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a); Stats. 2020, ch. 317, § 3.5.) It also includes permissive provisions providing a procedural mechanism for a criminal defendant to seek relief for a violation of the statute. (§ 745, subd. (b).) Where a violation of the RJA has occurred, any resulting conviction or sentence may be rendered legally invalid, requiring retrial of an entire case after declaration of a mistrial, empaneling of a new jury, or vacatur of a judgment. (§ 745, subds. (e)(1)(A), (e)(1)(B), (e)(2).)

2. The RJA Created an Actual Conflict of Interest in This Case

Here, in arguing that no actual conflict of interest exists, petitioner focuses exclusively on whether there is evidence to suggest that the deputy public defender's statements or strategic decisions have the potential to adversely impact petitioner's case.

It is true that usually, "[a]n actual conflict of interest means 'a conflict that affect[s] counsel's performance—as opposed to a mere theoretical division of loyalties.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 309.) However, in our view, petitioner misapprehends the nature of counsel's required performance under the RJA, giving rise to the conflict in this case.

"Criminal defense counsel has the duty to investigate carefully all defenses of fact and of law that may be available to the defendant. . . . 'The defendant can reasonably expect that before counsel undertakes to act, or not to act, counsel will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation.' " (*In re Hill* (2011) 198 Cal.App.4th 1008, 1016-1017; *In re Gay* (2020) 8 Cal.5th 1059, 1076.) This duty extends to investigation and evaluation of potential claims under the RJA, since the failure to timely raise an RJA violation can constitute ineffective assistance of counsel. (*People v. Simmons* (2023) 96 Cal.App.5th 323, 337 [failure to raise a known RJA violation at the first opportunity constitutes ineffective assistance of counsel].)

Thus, when defense counsel becomes aware of a potential violation of the RJA, counsel has a duty to conduct an investigation of the circumstances surrounding such a claim and make an informed decision with respect to how best to advance his client's interests based upon the results of that investigation. As the trial court correctly observed, the failure to do so could constitute ineffective assistance of counsel. However, defense counsel is placed in an untenable position when the duty to investigate

9

an RJA claim arises from counsel's own comments.[4]  In such instances, the subject of such investigation is whether counsel himself harbors racial bias or animus, and the inquiry must include whether counsel's decision may be influenced in an unintentional or unconscious manner by implicit bias.  (§ 745, subd. (c)(2); *Bonds*, *supra*, 99 Cal.App.5th at pp. 828-830.)[5]  Thus, because the nature of any investigation in this case necessarily includes an assessment of whether a specific deputy public defender may harbor an unintentional or unconscious implicit bias, it is simply not an inquiry which that specific deputy public defender is equipped to conduct.  By definition, implicit bias includes unconscious assumptions (*Bonds*, p. 829), and the specific deputy public defender cannot reasonably be expected to even recognize its existence absent input from another, objective attorney.[6]  It is this tension—between petitioner's right to have counsel fully

---

[4]  We disagree with the dissent's effort to resolve the meaning or intent of the deputy public defender's comments to reach the merits of a potential RJA claim that has yet to be fully investigated or litigated in the trial court.  We observe that the threshold for establishing the right to an investigation and evidentiary hearing on an RJA claim is low, and may be satisfied even if, in the opinion of a reviewing court, there was clearly a permissible and race-neutral purpose for the statements in question.  (*People v. Howard* (2024) 104 Cal.App.5th 625, 653 [The trial court must hold a full evidentiary hearing on an RJA claim even if "the record shows a permissible purpose for the [attorney's statements] and fails to show the [attorney] harbored express racial bias or animus . . . ."].)

[5]  This conclusion echoes the view recently expressed by Justice Evans and Justice Liu of the California Supreme Court in a concurring statement denying review in *People v. Coleman* (2024) 98 Cal.App.5th 709, 725, noting that "an RJA violation occurs when specific actors, including counsel, exhibit racial bias—explicit or implicit," requiring the trial court to conduct a "probing inquiry" into the matter.  (*Ibid.*)

[6]  The declaration of the deputy public defender illustrates this problem.  Even when the prosecution brought to his attention that his comments potentially implicated

*[footnote continued on next page]*

10

investigate and pursue any potentially meritorious RJA claim and the specific deputy public defender's inability to objectively perform this task—that creates the conflict in this case.

It may be that after a thorough investigation, there is insufficient evidence to support a claim that the RJA has been violated or other factors may support a reasonable tactical decision to forego pursuing any RJA claim.[7]  However, it is inescapable that if petitioner is entitled to such an investigation and informed decision by counsel, the specific deputy public defender subject of the claim cannot be the one charged with

---

the RJA, his declaration addressed the issue by referring only to his subjective intent. While we do not doubt the sincerity of the deputy public defender nor his concern for his client, his subjective intent cannot be the basis of foregoing an investigation into the matter where it is his own perceptions that are placed into question.

[7]  We disagree with the dissent's analytical approach of seeking to first resolve whether the record evidences a meritorious RJA claim.  In our view, any such analysis is entirely premature.  The purpose of a motion brought under the procedures set forth in the RJA is to remedy an act of discrimination that has already occurred (*People v. Wilson* (2024) 16 Cal.5th 874, 954 ["The central purpose of the RJA is to provide meaningful remedies for proven racial discrimination . . . ."].)  However, the parties did not litigate, and the trial court did not rule on such a motion.  Instead, the issue before the trial court here was whether an actual or potential conflict required removal of counsel.  To require that the record already be sufficient to show the existence of an RJA claim against defense counsel before the trial court can remove counsel essentially requires that a conflict actually ripen into an act that has already caused defendant detriment before removal is appropriate.  This approach contradicts longstanding precedent that the trial court has discretion to remove counsel for the purpose of *preventing* an unripe conflict from actually materializing to the defendant's detriment.  (*People v. Noriega* (2010) 48 Cal.4th 517, 524; *People v. Bonin* (1989) 47 Cal.3d 808, 837 [The trial court may act merely upon a finding that "a conflict of interest is at least possible"].)

11

performing this task.**8** It is the inability of the specific deputy public defender to impartially fulfill this duty that creates the conflict of interest. Because the record in this case shows that an actual conflict of interest exists, the trial court did not abuse its discretion in ordering that a specific deputy public defender be removed from the case.

2. The Trial Court Could Also Remove the Deputy Public Defender To Prevent a Risk of Substantial Impairment of the Proceedings

Even in the absence of an actual conflict, we would find no abuse of discretion warranting reversal. In addition to expressing its concern that the failure to raise an RJA claim might constitute ineffective assistance, the trial court also stated that its order was intended to forestall any potential future RJA claim. Indeed, petitioner concedes that the trial court was concerned with insulating the proceedings from a future RJA claim, and further acknowledges that this was a legitimate concern, separate and apart from any conflict of interest. In our view, removal of counsel to prevent a potential violation of the RJA was also within the trial court's discretion under the circumstances presented in this case.

---

**8** At oral argument, all parties agreed on this point. For this reason, we also respectfully disagree with the dissent's repeated reliance on the absence of a record sufficient to establish an actual RJA claim. A motion under the RJA places the initial burden upon the defendant. (§ 745, subd. (a).) Thus, in the normal course, it is defense counsel who bears the obligation of developing a record in support of such a claim. When the nature of the alleged conflict at issue is the decision not to investigate or bring such a motion, it is inappropriate to rely on the absence of a record to support an RJA claim in order to conclude that no conflict exists. In such cases, the absence of a sufficient evidentiary record could very well be the very product of the asserted conflict. In our view, when faced with such a quandary, the trial court has discretion to take reasonable steps designed to remove any doubt from the proceedings.

12

While the RJA does not explicitly reference removal of an attorney as a potential remedy, our Supreme Court has repeatedly reaffirmed that a trial court has authority to remove appointed counsel to " 'prevent substantial impairment of court proceedings.' " (*Cole*, *supra*, 33 Cal.4th at p. 1187; *Muniga*, *supra*, 44 Cal.4th at p. 1124; *Avila*, *supra*, 46 Cal.4th at p. 695; *Clark*, *supra*, 52 Cal.4th at p. 993.)  Admittedly, the factual scenario presented in most of these cases involve defense counsel's failure to adequately or timely prepare for trial.  However, in our view, the potential of an RJA violation represents a risk of disruption far greater than that posed by counsel's untimely preparation for trial.

Under section 745, a violation of the statute established prior to entry of judgment can result in declaration of a mistrial or discharge of a jury and empaneling of a new jury. (§ 745, subd. (e)(1).)  A violation established after entry of judgment can invalidate a conviction or sentence.  (§ 745, subd. (e)(2).)  In both situations, the remedy would require retrial of either the entire case or portions of the case, consuming substantial judicial resources.  Clearly, such a result represents a far greater disruption to the orderly administration of justice than the need to grant a continuance due to counsel's failure to timely prepare.  Thus, if a trial court is justified in removing counsel to prevent a substantial impairment of court proceedings when faced with an unjustified request for a continuance, we see no reason why the trial court's discretion should not extend to situations in which removal may be necessary to prevent a future RJA claim.

Petitioner argues that any RJA claim has been "legally foreclosed" because petitioner has waived the claim by failing to raise it at the first possible opportunity. However, the statute expressly provides that waiver for failure to bring a timely claim is

13

not automatic but discretionary.  (§ 745, subd. (c).)  Additionally, as we have already pointed out, petitioner's purported waiver for failure to raise the claim may be the subject of a future claim for ineffective assistance of counsel (*Simmons*, *supra*, 96 Cal.App.5th at p. 337), which the trial court is entitled to consider in exercising its discretion.  As both the California and United States Supreme Courts have recognized, the judiciary has a "substantial state interest in protecting the integrity of the process from improper 'sandbagging' by a defendant" in cases where " '[s]trong tactical considerations would militate in favor of [a defendant] delaying the raising of the claim in the hopes of an acquittal, with the thought that if those hopes did not materialize, the claim could be used to upset an otherwise valid conviction at a time when reprosecution might well be difficult.' "  (*People v. Simon* (2001) 25 Cal.4th 1082, 1104; *Davis v. United States* (1973) 411 U.S. 233, 241.)

The trial court was entitled to weigh the risk of substantial impairment of the proceedings presented by the potential of a future RJA claim, or a future claim of ineffective assistance based upon the failure to timely raise an RJA claim in exercising its discretion.  Under these circumstances, the trial court does not abuse its discretion to remove counsel in order to both ensure defendant receives timely adequate representation and to ensure that an RJA claim, if meritorious, is brought timely to avoid substantial impairment of the proceedings.

C.  *Potential for Waiver*

Finally, we address petitioner's argument that any concerns related to conflict of interest or a future RJA claim can be adequately addressed by a knowing and intelligent

14

waiver.  We disagree that the offer of waiver establishes an abuse of discretion warranting relief in this case.

We agree with defendant that the right to conflict-free counsel may be waived. (*Alcocer v. Superior Court* (1988) 206 Cal.App.3d 951, 957-958.)  However, we express serious reservation with the proposition that the trial court's concerns regarding the potential for an RJA claim may be adequately addressed by waiver.  " 'A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.' " (*People v. Douglas* (1964) 61 Cal.2d 430, 435.)  However, "a defendant's waiver or attempted waiver of a right is ineffective where it would involve also the renunciation of a correlative duty imposed upon the court. . . .  'Although a defendant may waive rights which exist for his own benefit, he may not waive those which belong also to the public generally.'  . . .  'The law cannot suffer the state's interest and concern in the observance and enforcement of [a] policy to be thwarted through the guise of waiver of a personal right by an individual. . . .  "[A] law established for a public reason cannot be contravened by a private agreement." ' " (*People v. Stanworth* (1969) 71 Cal.2d 820, 833-834; *Cowan v. Superior Court* (1996) 14 Cal.4th 367, 371 [" '[A]n accused may waive any rights *in which the public does not have an interest and if waiver of the right is not against public policy*.' "]; *In re Stier* (2007) 152 Cal.App.4th 63, 78-79 [Where a statute is "regulatory in nature, intended to accomplish the government's objective by mandating certain affirmative acts," the mandate of such statute cannot simply be waived by actions of the parties."].)

While the RJA is a relatively new statute, it seems well accepted that it serves an important public purpose. As the Court of Appeal has recognized, the purpose of the RJA is not only to remedy the effects of racial bias on individual criminal defendants but to eliminate the impact of such bias "on our system of justice as a whole" because "[d]iscrimination undermines public confidence in the fairness of the state's system of justice." (*Simmons*, *supra*, 96 Cal.App.5th at p. 332; *People v. Lashon* (2024) 98 Cal.App.5th 804, 809 [The intent of the Legislature was "to remedy the harm to the defendant's case *and to the integrity of the judicial system.*"]; *Bonds*, *supra*, 99 Cal.App.5th at p. 828 [The Legislature's express purpose was " 'to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable [and] inimical to a fair criminal justice system . . . .' "].) Thus, the interests protected by the RJA are not merely those of the criminal defendant but the public's interest in eliminating racial bias from the criminal justice system.

To be sure, the RJA includes a provision that an RJA claim which is not timely raised by a criminal defendant "may be deemed waived." (§ 745, subd. (c).) However, it is far from clear that the defendant's waiver in this manner can relieve the trial court or prosecution from the duty to ensure a proceeding free from racial bias or animus. After all, section 745, subdivision (a)'s language places a mandatory duty on the *state* to "not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." It would seem contrary to the Legislature's intended purpose to hold that a criminal defendant may relieve the *state* of its mandatory duties

16

under the statute by entering a waiver, thereby permitting the trial court or prosecutor to knowingly and openly proceed in a manner that the Legislature has declared is in violation of public policy.[9]

Ultimately, we need not decide whether an RJA claim is subject to express waiver because the trial court retains discretion to remove counsel even where a defendant offers to enter an otherwise valid waiver of his interests. (*Jones*, *supra*, 33 Cal.4th at p. 241 [A trial court " 'must be allowed *substantial latitude* in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.' "]; *People v. Suff* (2014) 58 Cal.4th 1013, 1039 [trial court has discretion to "rejec[t] defendant's offer to waive [a] conflict" and instead disqualify counsel].) Thus, even assuming without deciding that petitioner's claims could be validly waived, petitioner is still not entitled to relief unless he shows the trial court abused its discretion when making its order.

Based upon the record before us, we discern no such abuse of discretion. Specifically, whether a trial court's decision was arbitrary, capricious, or exceeds the bounds of reason is viewed "in light of the showings made and the facts known by the trial court at the time of the court's ruling." (*People v. Merriman* (2014) 60 Cal.4th 1,

---

[9] We also observe that at least one Court of Appeal has concluded that an RJA violation is akin to structural error and is not subject to a case-specific prejudice analysis. (*Simmons*, *supra*, 96 Cal.App.5th at pp. 337-339.) While we have no need to make that determination here, we note that such a conclusion certainly contradicts the suggestion that an RJA claim can be waived by advanced waiver.

17

37-38; *People v. Thompson* (2016) 1 Cal.5th 1043, 1079.) As relevant here, nothing in the record suggests that petitioner ever offered to enter a waiver of any conflict of interest or a future RJA claim at any time during the trial court proceedings.[10] Even in this writ proceeding, petitioner's original contention was that his RJA claim was waived by his failure to timely assert the claim and suggests only that some, undisclosed waiver could be entered in the future.

The trial court does not abuse its discretion in failing to consider facts which were never placed before it when reaching its decision. The trial court could not have abused its discretion by failing to accept a waiver where no offer of waiver was ever made by petitioner. Because petitioner has not established an abuse of discretion by the trial court, he has not shown entitlement to relief.

---

[10] Instead, the trial court held a closed hearing in which the prosecutor's declaration accusing the deputy public defender of making statements implicating defendant's race was read to petitioner. After this reading, the trial court merely inquired whether petitioner still desired to have the deputy public defender continue representation. Such an exchange alone does not constitute a waiver (*People v. Phillips* (1985) 41 Cal.3d 29, 44 ["an effective waiver . . . must be express and understanding, in response to specific advice by the court regarding the potential conflict and the right to new counsel if a conflict exists"]), and there is no indication in the record that petitioner ever offered to enter a waiver.

## IV.  DISPOSITION

The petition for writ of mandate is denied.  The previously ordered stay is vacated upon issuance of the remittitur.  (Cal. Rules of Court, rule 8.490(d).)

FIELDS
J.

I concur:

RAMIREZ
P. J.

19

[*Sanchez v. Superior Court*, E083015]

MENETREZ, J., dissenting:

A deputy public defender sought a more favorable plea offer and expressed the view that the criminal justice system is biased against Hispanic defendants like his client. As a result, the district attorney moved to disqualify both the deputy public defender and the entire public defender's office on the ground that the deputy public defender's "race/ethnicity-based remarks" gave rise to a potential claim *against the deputy public defender* under the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1) (RJA), creating a conflict of interest. The trial court granted the motion in part, removing the deputy public defender and "anybody who has touched the case" but not disqualifying the entire public defender's office.

The record contains no evidence of a potential RJA claim against the deputy public defender. The trial court's ruling was therefore erroneous and prejudicial, depriving defendant Enrique Sanchez of an attorney whom he wanted to keep and who was zealously representing him. We should accordingly grant Sanchez's petition, directing the trial court to vacate its order and enter a new order denying the district attorney's frivolous motion.

I.      *Background*

Sanchez was charged with kidnapping to commit rape (Pen. Code, § 209, subd. (b)(1); unlabeled statutory references are to this code), rape by force or fear (§ 261, subd. (a)(2)), infliction of corporal injury on a spouse or cohabitant (§ 273.5, subd. (a)), forcible oral copulation (§ 287, subd. (c)(2)(A)), and assault with a deadly weapon

1

(§ 245, subd. (a)(1)).  Kidnapping to commit rape carries a sentence of life without parole.  (§ 209, subd. (b)(1).)

On October 13, 2023, the deputy public defender representing Sanchez met with the deputy district attorney to discuss a plea bargain.  The deputy district attorney offered 14 years, and the deputy public defender sought a better offer.  Their accounts of ensuing events overlap in certain respects but diverge in others.

According to the deputy district attorney's declaration, when the deputy public defender failed to obtain a better offer, he "exclaimed 'I really don't care.'  [The deputy district attorney] proceeded to ask him what he meant by that statement and [he] stated, 'read between the lines . . . , I am a white man, what do I care?  It's not my people we are incarcerating.'  [¶]  In response, [the deputy district attorney] stated 'what do you mean exactly?  Are you asking me to give Mr. Sanchez a better deal because he is brown and I am brown?' to which [the deputy public defender] immediately responded 'Yes! Exactly!  Because you are part of the problem.  Look around you, all the people being incarcerated are your people.  I will just look like a mean defense attorney.  You should be part of the solution.'"  The deputy district attorney then "immediately stood up and stated 'it did not matter what the Defendant's race is, whether they are brown, White, Asian, or Black, a crime has been committed and I am seeking what is fair and just.' [The deputy district attorney] proceeded to state, 'I am done with this conversation, I will not allow you to upset me.  I am completely done.'"  As the deputy district attorney left the conference room and entered the courtroom, she was "emotionally distraught from [the deputy public defender's] race/ethnicity-based commentary."  The deputy public

2

defender "was agitated" and "continued to follow" the deputy district attorney, asking her "multiple times" if she "'was going to take it out on his client'" because she was "mad" at him. The deputy district attorney "responded 'yes, yes, yes' to him so that he would leave [her] alone."

The deputy public defender's declaration describes the incident somewhat differently and adds some factual context. The same deputy public defender had represented Sanchez at the preliminary hearing, and he intended to call the victim, Jane Doe, as a witness. Doe "was present all morning waiting to be called as a witness by the defense" and "was also present after the lunch break," but "[w]hen it was time for the defense to call Jane Doe to the stand, she was gone." Doe later informed the deputy public defender that she had left because "she was told by the District Attorney Victim Advocate to go home." Doe subsequently told the police that "all the sexual intercourse was consensual, she was not raped, and she did not want to lie." When the deputy public defender received the prosecution's offer of 14 years, he "felt this offer was very unreasonable considering all the circumstances, the wishes of Jane Doe, and the fact that Jane Doe was recanting the kidnapping and rape allegations." He accordingly "attempted to persuade [the deputy district attorney] to consider many mitigating factors in an attempt to persuade her to make Mr. Sanchez a more reasonable offer." The deputy public defender asked "if she had considered that Mr. Sanchez was a youth offender in deciding upon her offer," and he "asked her if she had considered any RJA implications" as well as "the wishes of the victim Jane Doe."

3

The deputy public defender's declaration provides the following description of what happened next: "I used sarcasm to make a point about the systemic and pervasive racism that permeates every aspect of our justice system. I sarcastically said, I'm just a white guy why should I care. You are just sending another poor young Hispanic man to prison. I discussed Mr. Sanchez's race with [the deputy district attorney] because I recognize the history of racial bias, implicit bias, and systemic racial injustice in the criminal justice system. I felt like Mr. Sanchez and victim Jane Doe, both Hispanic individuals, had no voice in our justice system. [The deputy district attorney] responded by threatening Mr. Sanchez with life in prison if he did not take the fourteen-year offer."

According to the deputy public defender, the deputy district attorney became "upset and even angry to the point where [the deputy public defender] felt that [the deputy district attorney's] impartiality as a prosecutor might be compromised." He asked her "if she was going to take it out on" Sanchez "because she was so mad at" the deputy public defender. "She responded with one simple 'yes'." The deputy public defender's declaration states that he did not know the deputy district attorney's race, did not comment on it, and did not use the phrase "'your people.'" He claimed that the statements attributed to him in the deputy district attorney's declaration were all "either inaccurate or false" and that the deputy district attorney did not make the statement about "'seeking what is fair and just'" that appears in her declaration.

On October 16, 2023, the deputy district attorney emailed her superiors about the October 13 incident, describing it in essentially the same terms as in her subsequent declaration.

The deputy district attorney's supervisor appeared for the prosecution at hearings in Sanchez's case on October 13 and 27, 2023, so the deputy public defender assumed that the deputy district attorney "had been removed from Mr. Sanchez's case due to her statement indicating that she would treat him unfairly." The deputy district attorney appeared at the next hearing (November 8, 2023), but the deputy public defender did not know that because he was not there—a supervisor from the public defender's office covered that hearing.

At a hearing on November 29, 2023, the deputy public defender, the deputy district attorney, and her supervisor all appeared. The deputy public defender informed the court of his concern "that this particular prosecutor is going to hold her feelings towards me against Mr. Sanchez," because she had "admitted" it. He said that he had "asked her if she considered that he's a youth offender, racial justice reform, and her answer was 'No.'" He invited the prosecutor to recuse voluntarily, and when she declined, he said that he would "file a recusal motion." The deputy public defender explained that he was "not saying that she's done it yet" but that he was concerned "that she will not treat [Sanchez] equally, fairly, because of what she said." He expressed the belief that he would be "derelict in [his] duties as [Sanchez's] attorney not to put it on the record as she did," and he added, "I only care about one person. That's Mr. Sanchez. And so I just want him to be treated fairly." He also suggested that the deputy district attorney's supervisor meet with another attorney from the public defender's office to try to resolve the case, but the supervisor rejected that suggestion.

After the hearing, the deputy district attorney's supervisor approached the deputy public defender and told him that he "should not have put that on the record because now she was going to have to alert upper DA management."  "At every subsequent court date there [were] 8-15 district attorneys in court to observe Mr. Sanchez's case . . . ."

On December 4, 2023, the district attorney's office filed a motion to have the "potential RJA claim" against the deputy public defender disclosed to Sanchez, arguing that the deputy public defender had "created a conflict of interest for himself such that this court should evaluate removing [him] and the public defender's office from representing Sanchez."  In a supplemental brief filed four days later, the district attorney's office clarified that it sought "the public defender's removal from this case because [the deputy public defender's] RJA-implicating statements created a disqualifying conflict of interest."

On December 12, 2023, at a closed hearing on the record but outside the presence of the prosecution, the trial court had the deputy public defender read the deputy district attorney's entire declaration aloud to Sanchez.  The court asked Sanchez whether defense counsel had previously read the declaration to him or discussed it with him, and Sanchez confirmed that they had. The court then asked Sanchez whether, now that he had heard the declaration again and also had time to reflect on it since first learning of its contents, he still wanted the deputy public defender to represent him.  Sanchez confirmed that he did want the deputy public defender to continue to represent him ("Yes, sir.").  The court never explained to Sanchez any potential RJA claim, any potential conflict, or the alternatives available to Sanchez in light of a potential conflict.

On January 4, 2024, the court partially granted and partially denied the prosecution's motion. The court explained that the deputy public defender had "put something in the record that in my mind at least triggers the potential of an issue with the Racial Justice Act." Because of that potential RJA claim, the court ordered that the deputy public defender "not be assigned this case and that the Public Defender's Office is to wall off [the deputy public defender] and anybody who has touched the case—an investigator in this case—and reassign it to a new deputy."

Sanchez, no longer represented by the deputy public defender in question, filed the instant petition for writ review of the trial court's order.

II.    *Potential RJA violation*

The majority opinion reasons that the trial court properly disqualified the deputy public defender because his conduct evidences "a potential violation of the RJA." (Maj. opn., *ante*, at p. 9.) That is incorrect.

There are four ways to prove a violation of the RJA, and they are described in subdivision (a)(1)-(4) of section 745. Review of each of them quickly reveals that there is no evidence of a potential RJA violation by the deputy public defender in this case.

First, a defendant can prove an RJA violation by proving that "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race,

7

ethnicity, or national origin." (§ 745, subd. (a)(1).) There is no evidence that the deputy public defender exhibited any such bias or animus toward Sanchez.[1]

Second, a defendant can prove an RJA violation by proving that "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's

---

[1]    Both in the trial court and in this court, the district attorney has presented only one argument for the conclusion that the deputy public defender's conduct gave rise to a potential RJA claim:  The district attorney argues that the deputy public defender told the deputy district attorney that he, the deputy public defender, "does not care about Sanchez due to his race."  The majority opinion does not mention the argument, and it is meritless.

The argument is based on certain statements by the deputy public defender that are described in both attorneys' declarations, such as "'I am a white man, what do I care?'"  The district attorney interprets those comments as meaning that, in the middle of a plea negotiation in which the deputy public defender was advocating for a better deal for Sanchez and was expressing the view that the criminal justice system is biased against Hispanic defendants like Sanchez, the deputy public defender decided to inform the deputy district attorney that he, the deputy public defender, in fact does not care about Sanchez and that the reason he does not care about him is Sanchez's race.  The district attorney's interpretation is patently unreasonable.  Reasonably interpreted, the quoted comment means something like:  "The criminal justice system's bias against people of color does not adversely affect me personally, because I am white."  On any remotely reasonable interpretation, the comments in question do not reflect any racial bias by the deputy public defender against Sanchez or otherwise give rise to a potential claim under the RJA.

I also note that even though the incident occurred on October 13 and the deputy district attorney described it in detail to her superiors by email on October 16, the prosecution did not assert that the incident raised a potential RJA claim until seven weeks later (December 4), just days after the deputy public defender informed the court and the prosecution that he intended to file a motion to recuse the deputy district attorney.

8

race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2).) Sanchez's trial has not begun, so there is no evidence of such a violation.

Third, a defendant can prove an RJA violation by proving that "[t]he defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins who have engaged in similar conduct and are similarly situated, and the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained." (§ 745, subd. (a)(3).) Sanchez has not been convicted, and the deputy public defender did not charge him with anything. There is consequently no evidence of such a violation by the deputy public defender.

Fourth, a defendant can prove an RJA violation by proving that "[a] longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense," and the sentencing disparity is associated with the race, ethnicity, or national origin of the defendant or the victim. (§ 745, subd. (a)(4)(A)-(B).) Sanchez has not been sentenced, so there is no evidence of such a violation.

That should be the end of the matter. There is no evidence of any potential violation of subdivision (a)(1)-(4) of section 745 by the deputy public defender and hence no evidence that he potentially has violated the RJA. The district attorney's motion was therefore meritless and should have been denied.

9

The majority opinion does not mention subdivision (a)(1)-(4) of section 745. Instead, the majority opinion quotes the first of two sentences in subdivision (a) of section 745, which introduce the numbered subdivisions describing the four ways of proving an RJA violation. Those two sentences are: "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin. A violation is established if the defendant proves, by a preponderance of the evidence, any of the following[.]" (§ 745, subd. (a).) The majority opinion quotes only the first of those two sentences (maj. opn., *ante*, at p. 8) and thereafter assumes without explanation that the deputy public defender's conduct evidences "a potential violation of the RJA" (*id.* at p. 9).

The majority opinion's analysis is mistaken for several reasons. First, the majority opinion provides no explanation or authority to support the premise that one can prove a violation of the RJA by proving a violation of the first sentence of subdivision (a) of section 745 *without proving any of the specific violations described in subdivision (a)(1)-(4)*. I am not aware of any such authority, and the premise appears straightforwardly incorrect. The first sentence of subdivision (a) of section 745 generally describes the statute's goal of eliminating racial, ethnic, and national origin bias in criminal convictions and sentences, and the second sentence explains how to prove a violation of the statute— the defendant must prove by a preponderance one of the violations specifically described in subdivision (a)(1)-(4). The first sentence of subdivision (a) of section 745 does not provide an additional way of proving an RJA claim independent of the specific violations

10

described in subdivision (a)(1)-(4). I am not aware of any basis to interpret the statute in any other way, and the majority opinion does not articulate one.

Second, assuming for the sake of argument that one can prove an RJA violation by proving a violation of the first sentence of subdivision (a) of section 745 without proving any of the specific violations described in subdivision (a)(1)-(4), the majority opinion is still mistaken because there is no evidence of a potential violation of the first sentence of subdivision (a) by the deputy public defender. Again, that sentence provides: "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) The deputy public defender is not the state and has not sought, obtained, or imposed a conviction or sentence on Sanchez. There is consequently no evidence of a potential violation of the first sentence of section 745, subdivision (a), by the deputy public defender.

Third, the only possible basis for the majority opinion's reasoning appears to be the following: By expressing the view that the criminal justice system is biased against Hispanic defendants like Sanchez and seeking a more favorable plea offer on that basis, the deputy public defender was soliciting a violation of the first sentence of subdivision (a) of section 745, because he was attempting to induce the prosecution to agree to a (more favorable) sentence on the basis of Sanchez's race. That analysis must be unsound, however, for the following reason: If it were sound, then *a motion for relief under the RJA would itself constitute a violation of the RJA*. For example, a motion under subdivision (a)(4)(A) of section 745 seeks a more favorable sentence on the basis of the defendant's race—the motion seeks to show that the defendant got a longer

11

sentence than similarly situated defendants of other races and that such racially disparate sentences are frequently imposed, so the defendant should get a more favorable sentence because of his race. If what the deputy public defender did in this case—seek a more favorable sentence for Sanchez on the ground that the criminal justice system is biased against defendants of Sanchez's race—potentially violates the RJA, then a motion under subdivision (a)(4)(A) of section 745 must potentially violate the RJA as well. But it would be absurd to interpret the RJA as prohibiting the motions for relief that the RJA itself authorizes. The majority opinion's (implicit) reasoning therefore cannot be correct. (See *Lopez v. Ledesma* (2022) 12 Cal.5th 848, 858–859 [statutory interpretations that lead to absurd consequences must be avoided].)

Finally, I should address the majority opinion's suggestion that the deputy public defender must be investigated for potentially harboring "an unintentional or unconscious implicit bias" against Sanchez. (Maj. opn., *ante*, at p. 10.) On the one hand, the record contains no evidence that the deputy public defender harbors any such bias. On the other hand, the RJA's legislative findings state that "*all persons* possess implicit biases" (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2, subd. (g), italics added), but surely it does not follow that every lawyer, judge, and juror involved in any criminal case must be investigated on that basis and hence must be disqualified. (See *Lopez v. Ledesma*, *supra*, 12 Cal.5th at pp. 858-859.) Given the complete absence of any evidence that the deputy public defender harbors any conscious or unconscious bias against Sanchez or that any such bias has adversely affected his representation of Sanchez, there is no basis to investigate him for such bias.

12

In sum, the record does not contain a shred of evidence of any potential violation of the RJA by the deputy public defender. There is nothing to investigate, no potential conflict, and no basis to disqualify the deputy public defender from representing Sanchez. The district attorney's motion was wholly without merit and should have been denied.

III. *Waiver*

The majority opinion concludes that the trial court did not abuse its discretion by failing to give Sanchez an opportunity to waive any potential conflict resulting from the deputy public defender's alleged potential violation of the RJA. (Maj. opn., *ante*, at p. 13.) The majority opinion gives two reasons for that conclusion: (1) It is not clear that a conflict based on a potential RJA claim is waivable, and (2) because Sanchez did not spontaneously offer to waive the potential conflict or RJA claim, the trial court did not abuse its discretion by disqualifying the deputy public defender. (Maj. opn., *ante*, at pp. 13-17.) The majority opinion is mistaken on both points.

First, the RJA expressly provides that an RJA claim may be "deemed waived" if it is not timely raised. (§ 745, subd. (c).) Given that RJA claims can be implicitly waived by inaction (or failure to take timely action), they must also be capable of being expressly waived—it would make no sense for the statute to bar defendants from consciously and intentionally doing what the statute allows them to do by inadvertence. The majority opinion's only contrary argument is that "it is far from clear" that a defendant's waiver "can relieve the trial court or prosecution from the duty to ensure a proceeding free from racial bias or animus." (Maj. opn., *ante*, at p. 15.) The claim is largely correct but irrelevant. A defendant's express waiver of a specific RJA claim based on specific prior

13

conduct does not grant the prosecution and the trial court license to infect the proceedings with racial bias. It merely waives the specified potential claim based on the specified past conduct. In this case, if Sanchez had expressly waived any potential RJA claim or potential conflict based on the deputy public defender's conduct at issue, the waiver would not have otherwise freed "the trial court or prosecution from the duty to ensure a proceeding free from racial bias or animus." (Maj. opn., *ante*, at p. 15.) The majority opinion articulates no reason why such an express waiver would be prohibited, given that the statute expressly authorizes an implied waiver of the same claim if it is not timely raised. Indeed, if Sanchez does not timely file a motion raising the claim, it may be deemed waived pursuant to section 745, subdivision (c). And Sanchez might have good reasons for expressly waiving the potential RJA claim against the deputy public defender or for failing to raise it in a timely motion. For example, Sanchez might believe (correctly) that no such claim exists.[2]

Second, the trial court did not inform Sanchez of the potential RJA claim and the related potential conflict, advise him of his options, and give him an opportunity to waive the claim and conflict. That failure was an abuse of discretion. (*People v. Noriega* (2010) 48 Cal.4th 517, 524 [attorney general conceded that "the trial court abused its

---

[2]    The majority opinion also suggests that because the RJA "serves an important public purpose" (maj. opn., *ante*, at p. 14), waiver of RJA claims might be prohibited. It is difficult to square that suggestion with the well-established proposition that claims under *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258, which serve the same public purpose of ensuring that criminal convictions are not based on race discrimination, can be waived. (See *People v. Morrison* (2004) 34 Cal.4th, 698, 710; *People v. Hayes* (1990) 52 Cal.3d 577, 605.)

14

discretion in replacing the public defender without explaining to defendant the potential pitfalls of keeping counsel who has an ethical conflict and without advising defendant of the alternatives available to him"].)  And the error was prejudicial because the record strongly suggests that Sanchez would have waived the conflict if given the opportunity. After the deputy district attorney's declaration was read in its entirety to Sanchez, he stated that he still wanted the same deputy public defender to represent him.  And that is not surprising, because the record reflects that the deputy public defender has done nothing but zealously advocate for Sanchez and attempt to obtain the most favorable possible outcome for him within a system that the deputy public defender believes is biased against Sanchez because of his race.

*　*　*

For all of the foregoing reasons, I conclude that the district attorney's motion was meritless, so the trial court erred by granting it even in part.  There is no evidence of a potential RJA violation by the deputy public defender, and insofar as the trial court disagreed, it should have fully informed Sanchez and given him the opportunity to waive the conflict.  We should grant Sanchez's petition and direct the trial court to vacate its order and enter a new order denying the motion in its entirety.  I therefore respectfully dissent.

MENETREZ _____

J.

15

Filed 11/8/24

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

**ORDER**

| | |
|---|---|
| ENRIQUE SANCHEZ, | |
| Petitioner, | E083015 |
| v. | (Super.Ct.No. FSB23000105) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

THE COURT

The request for publication of the nonpublished opinion filed in the above matter October 31, 2024, is GRANTED. The opinion meets the standards for publication as specified in California Rules of Court, rule 8.1105(c)(2), (6), and (9).

1

IT IS SO ORDERED that said opinion filed October 22, 2024, be certified for publication pursuant to California Rules of Court, rule 8.1105(b).

FIELDS
J.

We concur:

RAMIREZ
P. J.

MENETREZ
J.

2